[No. S010856. June 21, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT CUNNINGHAM, Defendant and Appellant.

**COUNSEL**

Cary B. Lerman and Joel R. Isaacson, under appointments by the Supreme Court; Munger, Tolles & Olson and Monica Wahl Shaffer for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson, Robert S. Henry and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GEORGE, C. J.—Following the guilt phase of a capital trial, a jury found defendant Albert Cunningham guilty of first degree murder based upon robbery felony murder (Pen. Code, § 187, subd. (a)) and robbery (Pen. Code, § 211) of Carmen Enrique Treto, and made a special finding that defendant intended to kill the victim. The jury also found defendant guilty of attempted murder (Pen. Code, §§ 187, subd. (a), 664) and attempted robbery (Pen. Code, §§ 211, 664) of Juan Cebreros. The jury found defendant guilty of possessing a firearm, having been convicted previously of a felony. (Pen. Code, § 12021, subd. (a).) The jury found true the allegations that defendant personally used a firearm in the commission of the offenses (Pen. Code, § 12022.5), and that he personally inflicted great bodily injury in the commission of the attempted murder and attempted robbery (Pen. Code, § 12022.7). The jury found true the allegations that defendant had suffered prior convictions of murder and of assault with a deadly weapon upon a police officer (Pen. Code, § 667, subd. (a)). Finally, the jury also found true two special circumstances: (1) that defendant committed the murder of Treto in the course of a robbery (Pen. Code, § 190.2, subd. (a)(17)); and (2) that defendant previously had been convicted of second degree murder (Pen. Code, § 190.2, subd. (a)(2)).

At the penalty phase, the jury fixed the penalty at death. The trial court denied defendant's motion for a new trial and the automatic motion for modification of the verdict, and imposed a sentence of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code § 1239, subd. (b).)[1] We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt phase evidence*

The prosecution's evidence established that defendant, wearing a distinctive three-piece suit, went to a bar in Pasadena where the victims, Carmen Treto and Juan Cebreros, were socializing and consuming alcoholic beverages. Several times during the evening, Treto displayed a large amount of cash. At approximately 2:00 a.m., the victims left the bar. Cebreros started for home, decided that Treto was too drunk to drive, and then returned for him. After some discussion, the two proceeded to the parking lot behind the bar, where they were about to enter Treto's vehicle. Defendant approached the two, drew a gun, demanded Treto's cash, and then fatally shot Treto. Cebreros attempted to flee, and defendant shot at him, wounding him in the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

thigh. Defendant fled in Treto's automobile. Two weeks later, defendant, wearing the same distinctive suit, returned to the same bar, where he was recognized by the staff. The police were summoned, and defendant was arrested.

On December 1, 1985, Maria Treto and her husband Carmen Treto were at their Pasadena residence. Her husband recently had received $1,400 or $1,500 in cash as payment for a job. At approximately 9:00 p.m., Mr. Treto, carrying the money on his person, departed with his friends in Treto's white and black Buick LeSabre automobile.

On the same evening, Juvenal Gallegos was working as a door monitor at the Pair of Aces, a bar located on the 1200 block of North Lake Avenue in Pasadena. Angel Gallegos (no relation), the manager of the bar, observed Carmen Treto, who was very drunk, at the bar. Juan Cebreros and his brother Favio arrived at the bar at approximately 11:00 p.m. Juan Cebreros played pool with Treto.

At various times during the period from 7:00 p.m. nearly until the 2:00 a.m. closing time, Angel Gallegos, Juvenal Gallegos, and eventually Juan Cebreros all observed defendant at the bar. Defendant, an African-American in his 40's, was approximately 5 feet 10 inches in height and quite slender. He wore a burgundy three-piece pinstripe polyester suit and tie and had on thick glasses with dark rims. He had a mustache that connected with a goatee-like beard, and his hair in back was shoulder-length at the middle. One of defendant's front teeth was gold.

Prior to 1:30 a.m., defendant departed from the Pair of Aces and, carrying a long-neck bottle of Coors beer, entered Ricky's Lounge, a bar just up the street. Jeff Donald, the bouncer, took the bottle from defendant and handed it to Diana Riley, the bartender. Defendant had been present in Ricky's Lounge for brief periods on several occasions earlier in the evening.

On the final occasion, defendant remained in Ricky's Lounge approximately one-half hour, purchasing a Budweiser beer and playing three games of pool with Keith Anderson, Riley's boyfriend. Anderson observed that although defendant was left-handed he held his left arm or hand close to his body and, when he was not playing, kept his arms folded so that his coat did not open. Defendant went to the restroom and remained there for some time. When Riley called for him to hurry because the bar was closing, defendant asked for a couple of minutes. When he emerged from the restroom he put down his beer and left the bar.

Meanwhile, following defendant's departure from the Pair of Aces shortly before 1:30 a.m., Juan Cebreros left that establishment before closing time,

just prior to Treto's departure. Although others in the bar previously had urged Treto to leave, he had refused and apparently was the last customer to leave the bar at closing time. Juvenal Gallegos, the door monitor, observed that Treto had a wad of money, consisting of $100 and $50 bills, visible in his front shirt pocket. As he departed, Treto grabbed Juvenal and told him: "Keep on going the way [he] had been."

Juan Cebreros observed that after Treto emerged he remained in front of the bar, standing by a lamppost. Cebreros departed in his own vehicle but returned after a few minutes to offer Treto a ride because Cebreros realized that Treto was too drunk to drive and was by himself. When Cebreros drove up, Treto remained by the lamppost. Cebreros parked his vehicle several places from Treto's Buick LeSabre in the darkened parking lot at the rear of the bar, walked up to Treto, and offered him a ride home. Treto and Cebreros began to walk toward the parking lot. A stocky African-American man riding a bicycle approached and began talking to Treto. Treto told the man that they should be friends and that "Blacks and Mexicans are friends," and they embraced. Treto was not agreeable to being driven by Cebreros, but insisted that Treto drive them both to Treto's residence in his own vehicle. Treto reached the vehicle and bent down to put the key in the driver's side door while Cebreros stood several feet away.

By this time defendant had appeared, walking in the driveway from the direction of Ricky's Lounge. Cebreros heard defendant say, "Hey, amigo, give me the money." Cebreros observed defendant behind Treto, holding a gun in both hands with arms outstretched, pointing it at Treto. Defendant said, "This is a .357 magnum." The man on the bicycle was still in the area but did nothing. Cebreros took out his wallet. Treto straightened, turned to his right to face defendant, and put out his hand or hands. Immediately, defendant fired and shot Treto in the chest. Cebreros began to run away, and defendant fired at him, wounding him in the right thigh. Cebreros fell but got up and continued to run, hearing the sound of a vehicle engine starting in the parking lot. Cebreros ran into a nearby fast-food restaurant and asked the people there to telephone the police. A patrol vehicle arrived and drove Cebreros back to the scene of the shooting.

At approximately 2:20 a.m., Deputy Sheriff Key was on the northeast corner of Hill Avenue and Washington Boulevard in Pasadena, when he observed an African-American man in his 30's wearing glasses, with hair several inches in length, driving a white two-door Buick with a black top and without headlights illuminated, eastbound on Washington Boulevard. Approximately 2:30 a.m., Police Officer Edwards was writing parking tickets on East Washington Boulevard, when he observed an African-American man

driving a large white and black-top American sedan eastbound without headlights illuminated. Two minutes later, Officer Edwards received instructions over his police radio to proceed to the Pair of Aces. In the parking lot of the bar, he observed Treto lying flat on his back, with several Mexican men standing nearby. Treto's shirt was open and he had a gunshot wound in the chest, from which blood was bubbling. Treto was having difficulty breathing and did not appear to be conscious. One of Treto's shoes had been removed and a small amount of cash was on the ground. Officer Edwards summoned paramedics.

Officer Thomas was instructed to collect physical evidence and to photograph the crime scene. Arriving at approximately 2:30 a.m., he found a small amount of cash on the ground and eight $1 bills in Treto's pants pocket, but Treto's wallet did not contain any money, nor was there money in his shoes, shirt, or jacket. Treto's vehicle was gone. Officer Thomas unsuccessfully searched the area for a bullet.

The paramedics treated Cebreros at the scene for a gunshot wound caused by a bullet that had entered and exited from his thigh. Officers Ortiz and Carter soon arrived, and approximately one hour after the shooting, Cebreros told Officer Ortiz that before Treto was shot, Treto had extended his hands. Cebreros did not say that Treto had reached for defendant's gun. Cebreros was transported to the hospital, and later described to Officer Baroni the suspect's height and appearance, stating that the suspect wore a brown suit, had glasses, and wore a beard. Cebreros was treated and released, subsequently having to use crutches for a few weeks.

Treto was transported to the hospital. The medical examiner concluded that his death was caused by uncontrollable hemorrhage with cardiac arrest. The .357 magnum caliber bullet had traveled from front to back, right to left, and slightly downward, injuring structures in the abdominal cavity, liver, a major blood vessel, other veins, and the small bowel, lodging in the spine. The injury to the liver and major vessel caused heavy bleeding, resulting in rapid death. There was no gunpowder residue around the entrance of the wound. Treto had a bruise on his left knee and a bruise on top of his right foot. Treto had a .17 percent blood-alcohol level, and .35 micrograms per million of cocaine in his system, indicating usage within several hours of death.

A police firearms expert examined the bullet removed from Treto's body and determined that the bullet was .38 caliber, capable of being fired either from a .38 special or a .357 magnum weapon. The expert testified that in general, gunshot residue is found on the target and surrounding surfaces if

they are within three feet of the weapon and is less likely to be found if the target and surrounding surfaces are within four or five feet of the weapon, and that such residue would not be found if the target is six feet or more from the weapon. The expert observed that Treto's jacket did not have gunshot residue on the front near the bullet's entry point, on the sleeves, or other areas that would have been in proximity to the gun if Treto had attempted to grab the gun at the time it was fired.

Police Officer Eldridge obtained a description of defendant from interviews with witnesses at Ricky's Lounge and retrieved the Coors beer bottle confiscated from defendant earlier. The police tested the bottle for fingerprints, but defendant's prints were not among those found.

On December 3, 1985, the police located Treto's vehicle, "stripped" and abandoned on 126th Street in the City of Compton. The police fingerprint technician examined the vehicle interior and exterior but was able to identify only fingerprints belonging to Mrs. Treto on the rearview mirror. The technician testified that rain can wash off fingerprints on the exterior of a vehicle. It had rained on December 2, 1985.

On December 13, 1985, defendant returned to the Pair of Aces. Defendant approached Margarita Medrano, took her hand, and remarked that he had promised he would return, and "there he was." Meanwhile, Angel Gallegos and Juvenal Gallegos recognized defendant, and Angel telephoned the police. Officer Delgado was dispatched to the scene and met with Margarita Medrano outside the bar. Angel Gallegos informed the officer that he recognized the man currently inside the bar as having been present in the bar on the night of the shooting and that he believed him to be involved in the murder. Officer Delgado went inside, observed that defendant fit the description of the suspect, arrested him, and transported him to the police station.

At approximately 1:15 p.m. on December 16, 1985, Officer Baroni, the investigating officer on the case, in the presence of Officer Gallon, spoke with defendant in a jail interview room. After Officer Baroni advised defendant of his constitutional rights pursuant to *Miranda*,[2] defendant waived those rights. The interview was not tape-recorded.

Officer Baroni told defendant that between December 1 and 2, a shooting had occurred during a robbery or attempted robbery on the 1200 block of

---

[2](*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*); see *Dickerson v. United States* (2000) 530 U.S. 428, 439-440 [120 S.Ct. 2326, 2333-2334, 147 L.Ed.2d 405] [concluding *Miranda* announced a constitutional rule not susceptible of legislative supercession and declining to overrule the decision].)

North Lake Avenue and one of the victims had died. Officer Baroni asked whether defendant ever had been arrested. Defendant stated he had been arrested for "driving under the influence." Asked whether he ever had owned a handgun, defendant stated he had not. Defendant told Officer Baroni that he lived with Aubrey Vaughn (also known as Rosa Vaughn, defendant's mother) and Victor "Junior" Washington, had worked as a word processor for Kaiser Permanente Hospital for nine years, and presently worked at the Boys Club in Pasadena.

Officer Baroni asked defendant what he had been doing on the night of December 1 and the early morning of December 2. Defendant explained that on Sunday, December 1, he had assisted his friend Beverly Son in locating an apartment to rent in Pasadena. He stated he did not drive and normally took the bus. He stated that generally he drank only California Coolers rather than beer. He stated he had something to drink on that evening but never drank to the point that he could not remember what had happened while he was under the influence of alcohol.

Officer Baroni described the circumstances of the shooting. Defendant stated that he did not shoot anybody and "most certainly didn't kill anybody." In response to further questions, defendant stated he did not own a maroon three-piece suit but did own a brown three-piece suit with pinstriping. Defendant recalled that he had been out drinking on three occasions since December 1. Defendant stated he had at some point gone to the Pair of Aces and Ricky's Lounge.

Officer Baroni again inquired concerning defendant's activities on the evening of December 1. Defendant explained that normally he went to a bar on Fair Oaks and Colorado and then took the bus to the Pair of Aces, departing at 10:00 p.m. when the buses stopped running. That night he did not walk into the Pair of Aces or Ricky's Lounge with a bottle of beer, because he drank only California Coolers, but someone at Ricky's Lounge had asked him to relinquish a bottle containing such a beverage and he placed it on the bar. Defendant recalled playing pool with an African-American male at Ricky's Lounge but did not order beer or speak to a woman. He remembered departing from the bar at 10:00 p.m., and when the bus did not appear someone gave him a ride to his mother's residence. Everyone there was asleep, and he also retired. Officer Baroni wrote down a description of defendant's account of his whereabouts on the evening of December 1 and on the following morning, which defendant reviewed and initialed.

On December 16, 1985, Officer Baroni displayed a photographic lineup of six African-American males, including defendant's photograph, to Cebreros,

who affirmatively identified defendant as the man who had shot him. On December 17, Officer Baroni conducted a search of the residence of Mrs. Vaughn, located two miles from Lake Avenue, and discovered a brown three-piece pinstripe suit in defendant's room. Further investigation revealed that Treto's vehicle was recovered from a location within a relatively short distance of an address where defendant had lived with his former wife in May 1985 and near Mrs. Vaughn's address where he was staying in July 1985. A business associate of defendant's, who had known him since 1984, had seen him wear a burgundy three-piece suit on several occasions.

The defense rested without presenting evidence.

The jury found defendant guilty of first degree murder and made a special finding that defendant had acted with the intent to kill. The jury also found defendant guilty of robbery, attempted murder, attempted robbery, and possessing a firearm after having suffered a prior felony conviction. The jury found true the allegations that defendant personally used a firearm in the commission of the offenses and personally inflicted great bodily injury in the attempted murder and attempted robbery. The jury also found true the alleged special circumstance that defendant committed the murder in the commission of a robbery.

B. *Evidence of prior convictions*

After the foregoing verdicts and findings were rendered, the prosecution presented evidence of defendant's prior convictions. Through the testimony of the investigating officer, Deputy Sheriff Kushner, and court records, the prosecution presented evidence that defendant was convicted on August 6, 1976, of the second degree murder of Ella Mae Fellows, committed on June 1, 1975. Defendant was released from prison on parole on February 6, 1980.

Through the testimony of defendant's parole officer and court records, the prosecution presented evidence that, upon his plea of guilty, defendant was convicted on January 20, 1981, of assault with a deadly weapon on a police officer, committed on September 20, 1980. Defendant was released from prison on parole on November 14, 1984.

The defense rested without presenting evidence.

The jury found true the allegations that defendant previously had been convicted of second degree murder and of assault with a deadly weapon upon a police officer. The jury also found true the special circumstance that defendant committed first degree murder after previously having been convicted of murder.

## C. *Penalty phase evidence*

### 1. *Defense case*

The defense was permitted at its request to present evidence in mitigation before the prosecution presented evidence in aggravation. The defense's first witness was defendant's mother, Rosa Vaughn, who testified that while she was eight months pregnant with defendant, his father, Albert Cunningham, Sr., hit and kicked Vaughn and she fell on her stomach. Defendant, born October 21, 1947, had to be delivered with forceps that left small holes on the sides of his head. He was in the hospital two months. Vaughn left Mr. Cunningham four months after defendant was born and moved in with her family. Defendant did not have any male influences in his early life other than Vaughn's brothers, who were working. They lived in South Central Los Angeles.

Defendant started school, accelerating a grade because he was intelligent. Defendant began to have psychological problems, and Vaughn took him to be examined by several psychiatrists and spoke with several ministers about his behavior. Vaughn took him to be examined by a neurologist, who passed away before treatment was completed.

In 1954, when defendant was seven years of age, Vaughn married Leland Young. Young did not understand children, was very negative, and frequently "strapped" defendant, making him fearful. By the time defendant was eight or nine years of age he frequently was in trouble at school, and therefore Vaughn decided to send defendant to live with his father, where he remained for eight months. Albert Cunningham, Sr., had been in juvenile hall, had committed a robbery prior to defendant's birth, and had been shot. At the time defendant lived with him, defendant's father was an alcoholic and worked as a pimp, drug dealer, and gambler. At one point his father beat defendant and injured his penis, causing blood to flow from it. Vaughn summoned the police, who appeared but did not pursue the matter.

When defendant was eight years of age, he drove off in Vaughn's sister's automobile. A family friend who observed the vehicle thought that a midget was driving but recognized defendant and telephoned Vaughn's sister. Defendant, who had learned to drive by observing his uncle, was a fairly good driver and did not get into an accident. Vaughn explained to defendant that taking automobiles was wrong, but defendant continued to engage in this conduct. Defendant also took another child's bicycle even though defendant owned a new one. A neurologist told Vaughn that defendant had a compulsion to take other persons' property.

When defendant was 12 years of age, he was placed in a juvenile corrective facility because he had thrown rocks at a playmate's mother. Defendant spent much of the period during high school in juvenile facilities for the offenses of joyriding and vehicle theft. When defendant was 18 years of age, he was sent to prison. His defense attorney requested that defendant be examined by a psychiatrist prior to trial, but that step was not taken.

In 1972, defendant attempted to commit suicide, shooting himself with a shotgun he had tied to a chair. Defendant required eight hours of surgery and spent a year recovering. He continued to suffer stomach problems, "nervous condition," and headaches.

In 1975, defendant was incarcerated for the murder of Ella Mae Fellows. When Vaughn explained to defendant the effect of the offense on the victim's family, defendant expressed remorse. He explained that Fellows sold drugs and had given him drugs and alcohol that caused him to hallucinate.

In 1980, defendant, armed with Vaughn's husband's .38 revolver, was in a gunfight and was shot five times by police officers. He was sent to state prison and was confined to a wheelchair for two years. Following his release in 1984, defendant obtained a job at Fedco and enrolled in classes for computer and word processing training, in which he was at the top of the class. For several months at the end of 1985, defendant worked at Kaiser Permanente Hospital. Vaughn dropped him off at work on the morning of December 2, 1985. She did not see him driving a white automobile with a black top on December 1 or 2, 1985, or within the next two weeks.

Following his arrest for the present offenses, and while Vaughn visited defendant in custody, a deputy told her that defendant was a "hell of a guy" who had given the officer advice on learning how to deal with inmates, which proved useful in completing the deputy's probationary period. Defendant was enrolled in classes and requested that Vaughn obtain books for him that explained sign language so that he might assist deaf people. Defendant also employed English and mathematics texts to assist other inmates.

Vaughn believed that defendant had become "institutionalized" and seemed to do quite well in prison no matter where incarcerated. He did not cause problems, performed well at jobs, made gifts for his family or for charity at the prison woodshop, and won civic awards and commendations. Vaughn read to the jury some of these commendations. Vaughn believed that defendant wanted to help others, and he had written her requesting books to enable him to assist illiterate inmates in learning to read and write. From his

early years, defendant always wanted to be a minister and had a strong "Christian desire." While in prison, defendant completed ministry and Bible study courses and became an ordained minister. She believed that as such, defendant was an asset in prison. He also had an artistic side and made greeting cards and other artwork. Vaughn believed that defendant should receive a life sentence, because she did not believe in killing. Defendant was her only child. She asked the court and the jury to give defendant a chance to live, rather than punish him with death.

The defense's second witness was Reverend Johnnie Washington, who testified that he rented a room at Vaughn's residence in April 1983 and was living there at the time of defendant's arrest. Defendant had preached a sermon at Washington's church in August 1985, taught Sunday school every Sunday from August until December 1985, had been active in recruiting new members for the church, and had organized a youth choir. Washington believed defendant's life was worth saving because the Bible said "Thou shalt not kill." Washington loved defendant very much.

An employee of Volt Temporary Services next testified that defendant had been placed at Kaiser Permanente Hospital in Pasadena on November 25, 1985, and work records established he had worked there until December 13, 1985. His employment application indicated he had attended Sacramento High School and two years of college at the University of Southern California. He informed the agency that he previously had been convicted of a felony in the 1960's, for which he had received probation.

The defense's final witness was defendant himself, who testified that he understood what he was facing and wanted to live. When he was young his father boasted about having been in several institutions, stating it was "no big thing." While defendant was staying at his father's residence, prostitutes used the residence to "turn tricks," and defendant had had a sexual experience with one of the women working for his father. Once, defendant's father beat him for having broken a water pipe while playing. Defendant's father kept guns at the residence and once threatened defendant with a gun. His father taught defendant how to shoot and gave him a rifle. Defendant became expert and could shoot using only one hand.

Defendant was raised more by his aunts, uncles, and grandmother than by his mother. When he was eight years of age, defendant needed a ride to go to a park. When defendant stated he would drive himself, his uncle said, "Go ahead," without meaning it. Defendant drove the vehicle to the park but did not have enough gasoline to return to his residence. He stopped at a gasoline station and was detained by the attendant until the police arrived. Afterwards, his uncle beat him.

Defendant attended several grade schools. He tended to be disruptive and frequently was expelled. On one occasion, defendant and other children were throwing rocks. When a child was injured, the child's mother slapped defendant. He was too small to slap her so instead he threw a rock at her. He was placed in the California Youth Authority, where he discovered that gangs formed along racial lines and preyed on individuals who did not join them.

In high school, defendant was transferred to a new school that appeared to be a "school for gangs." While in high school, defendant received a 99 percent score on a college test in a class that his mother was attending. Defendant completed high school in a juvenile facility.

Defendant began stealing automobiles as a young teenager because it was a popular activity among his associates at the time. His juvenile record consisted of offenses for joyriding. He began stealing vehicles in order to make money, and in 1966 at 19 years of age was sentenced to serve a five-year prison term for vehicle theft. Due to his good conduct he was transferred to a camp, where he discovered that a group consisting primarily of correctional officers had a Ku Klux Klan organization. He requested a transfer and was moved to San Quentin Prison. Defendant began to find his identity. He worked as a commander's clerk, assisted in the snack bar, and cooked for the staff. He was transferred to Soledad Prison, where he taught school, worked in the administration, and stayed out of trouble, including any gang affiliation. Defendant was a member of the Men's Advisory Council. He published articles and poetry, including greeting card messages, and enrolled in a number of ministry courses.

Defendant also sought psychiatric assistance while in prison but was refused because the psychiatrists did not have time for him. When he did receive psychiatric treatment, he believed the psychiatrists did not want to prescribe medication for him but merely wanted to conduct "talk" therapy. They were supposed to evaluate him but simply wanted to be paid and were not helpful.

Defendant was paroled in 1971. He married Sharon that year, and in 1973 they had a daughter, Felicia. In 1971, defendant also trained as an inhalation therapist at the University of Southern California. He worked with psychiatric patients in Vacaville and Soledad.

In 1972, defendant became depressed and shot himself in the stomach. The wound resulted in several chronic conditions, including pancreatitis, which he treated by taking a painkiller, to which he became addicted and which, combined with his heavy drinking, caused hallucinations.

Defendant became acquainted with Ella Mae Fellows, a prostitute, several months prior to her death in June 1975. Defendant was not her pimp but acted as her protector and told his parole officer that she was his girlfriend. On the day of her death, they spent time together. They argued and yelled. Defendant was under the influence of a drug. Defendant knew that she had been stabbed eight times in the left breast. He could not remember whether he had killed her, but he did remember "red." Shortly after her death, defendant was found driving her automobile, but she often let him drive it, so that was not unusual. Defendant accepted the prosecution's "deal" on the ensuing murder charge because he did not know what had happened. He expressed sorrow to the family of the victim and was sorry that he did not know whether he had murdered her or not. He did not deny responsibility for the murder.

In 1976, as a result of this incident, defendant was sentenced to prison upon his conviction of second degree murder. He had no trouble adjusting to prison life. During that time, after a physician administered sodium pentothal, defendant began to remember more about the incident. He realized it had occurred during a time when he was experimenting with drugs. His actions were "impulsive," and he would not have done what he did had he not been "high."

In 1977, another prisoner swung at defendant after defendant called him a name, and the incident was reported by a prison guard. Defendant worked as a disc jockey at a prison radio station but was replaced because he left the radio room unattended for an hour. Originally defendant was restricted from working with women due to the nature of his offense, but the restriction later was removed. In May 1978, defendant's prison cell was searched and restricted items were discovered, but defendant had placed the items in his cell with the knowledge of the prison staff. That same month, defendant was subjected to a body search that revealed marijuana in his rectum. Defendant forfeited good conduct and work credits and spent time in the "hole." Defendant was released in February 1980.

In September 1980, defendant worked for Yellow Cab Company and stole a taxicab, because he had been cheated out of money. Defendant drove the taxicab to a location in Silverlake and won $6,000 gambling. To protect himself, defendant carried a gun despite his knowledge that this was illegal due to his prior felony conviction. To secure his winnings, defendant was forced to exit through the bathroom window. He drove away, but when he stopped at a red light, a person in a white T-shirt carrying a gun approached the taxicab and said, "Pull over or I will shoot." Defendant believed it was one of the men from Silverlake and stepped on the gas pedal. He was fired

upon but escaped. When the taxicab had a flat tire, defendant proceeded on foot. Running into a doorway, defendant yelled out that the persons pursuing him could have the money. The shots continued, and therefore he emerged from the doorway firing his weapon. Only at that point did defendant notice that his pursuer wore a police uniform. Defendant fell and became unconscious. When he regained consciousness, an officer was attempting to place a gun in defendant's mouth. Defendant turned his head to the side and was shot in the jaw. When defendant was handcuffed and lying on the ground, an officer shot him three more times. Defendant again lost consciousness, and when he awoke he found himself being transported in an ambulance. An officer attempted to beat defendant but was restrained by the ambulance driver.

Witnesses to the confrontation with the police believed that defendant was being robbed and heard defendant yell that they did not need to kill him to obtain the money. Defendant had attempted to defend himself. He was shot 12 times, causing nerve damage to his right arm, paralysis to his tongue on one side, lack of feeling in his jaw, and confinement to a wheelchair for two years. During his trial on a charge of assault with a deadly weapon on a police officer, he was heavily medicated and went along with whatever others wanted him to do. Afterwards he could not remember the trial. He felt sorry for what had happened and wished that the officer had identified himself. Defendant wrote a letter of apology to the injured officer.

Defendant began a seven-year prison term in 1981. In prison, defendant assumed clerical duties, performed occupational therapy, made ceramics, clocks, and jewelry, and wrote poetry. Defendant wrote to 1,167 people around the world to give them the "word of God" and otherwise wrote to 2,500 people per month. Although defendant was raised a Catholic, participated in the Nation of Islam during the 1960's, and was baptized in the Seventh-Day Adventist religion in 1971, he was ordained a minister in the Southern Baptist Convention in 1978. Defendant received certificates and awards from religious organizations.[3]

In late 1984, defendant's sentence was reduced for good conduct, and he was placed on parole. He attended the Chavez Institute to increase his

---

[3]On cross-examination, it was revealed that during his incarceration, defendant had been found engaging in sports although supposedly confined to a wheelchair. He was found to be in possession of a weapon and was disciplined for being in the same cell with a person found to possess a weapon. Defendant had problems with other inmates, participated in fights, asked to be moved, and was placed in administrative segregation. He was terminated from several prison jobs for failing to appear or showing little interest in doing the job. In one instance, he refused to follow the manager's directions to operate equipment and closed himself behind a door. He was dropped from a college program.

clerical skills, and met Beverly Son. Defendant was among the leading students in the class. In May 1985, defendant's wife Sharon discovered him with another woman and attacked her, provoking defendant to strike Sharon several times with a wooden paddle. Defendant was arrested and jailed for violation of the terms of his parole and was released in August 1985. In October 1985, defendant and Sharon separated. Defendant thereafter began to dedicate himself to God and lived with his mother. In November, defendant began to work at Kaiser Permanente Hospital and also at a job unloading trucks, where he attempted to organize a union. On Saturdays, he volunteered at the Boys Club in Pasadena. Defendant attended Alcoholics Anonymous (AA) meetings but continued to consume alcoholic beverages.

In the early evening of December 1, 1985, defendant and Beverly Son drove around looking for an apartment for Son closer to defendant's residence, because she was pregnant with his child. After he located an apartment for Son, defendant attended an AA meeting and then Son drove him home at 10:00 p.m. At approximately 10:45 p.m. defendant went out again to several bars, including the "Pair of Deuces" (*sic*: Pair of Aces) and Ricky's Lounge, and subsequently returned to his residence. Defendant did not have a gun in his possession and was not involved in killing Treto.

During his stay in jail awaiting trial on the current charges, defendant acted as a mediator between the jail officials and the inmates. He had been hired as a medication trustee and devised a new system that made the dispensing of medication to the inmates more efficient.

Defendant also explained that inmates had a physical need for "release," and that there were situations where two individuals would be found in a consensual sexual encounter but where the weaker person would claim the other raped him in order "to keep from getting a case." Defendant had had sexual encounters including sodomy, and had assumed the dominant role. Ordinarily defendant was heterosexual, but in those circumstances he was bisexual but not homosexual.

An inmate who had accused him of attempted sodomy was lying. Defendant merely visited him, asked for money that defendant was owed, and departed. Subsequently, an officer placed defendant in a lineup and someone accused him of attempted sodomy.

Defendant agreed that his life had been "long and full of violence and misdeeds," but asked the jury not to impose the death penalty. He could help young persons in many ways, for example through religion and encouraging them to obtain an education, even though they were in prison. Defendant had been incarcerated for 25 years of his life, had learned to live in prison, and

believed his prison record was basically good, with no problems. He had done bad things in prison but had not committed, or ever been prosecuted for, offenses while in prison.

## 2. Prosecution case

The prosecution presented additional information concerning the murder of Ella Mae Fellows. On June 4, 1975, Deputy Sheriff Kushner went to a vacant lot in the City of Carson where the body of Fellows, clothed in a blue and gray patchwork pantsuit, had been discovered. From the body, drag marks led to vehicle tire tracks, indicating Fellows had been murdered elsewhere and transported to the lot. The level of decomposition indicated that Fellows had been dead several days when her body was discovered. Fellows had suffered eight stab wounds to the left chest over the left breast. The wounds were orderly but of different degrees of penetration. Various wounds had penetrated the heart, lung, diaphragm, and stomach, and several of the wounds individually would have been fatal immediately.

On June 6, 1975, Deputy Sheriff Kushner searched defendant's apartment, located 80 blocks south of the lot where the body was discovered. The police observed a steak knife consistent in size with that responsible for Fellows's injuries. A box with a portrait of Jesus Christ on the lid was found that contained a Polaroid photograph of Fellows wearing the same pantsuit she was wearing when she was found. A magazine was discovered, which depicted scenes from a horror film in which the victim had wounds of approximately the same position and quantity as those suffered by Fellows.

Defendant was driving Fellows's vehicle when stopped by the police. A search of the vehicle revealed a Polaroid photograph of the victim wearing the same pantsuit and standing before the same background as in the photograph found at defendant's apartment. During police questioning, defendant denied having a relationship with Fellows and told the police that her boyfriend had given defendant the keys to her vehicle. Defendant denied committing the murder and claimed to have no recollection of his activities during that time period, although he did not attribute his lack of memory to having been under the influence of drugs.

The prosecution presented additional information concerning defendant's conviction for assault with a deadly weapon upon a police officer. At approximately 1:00 a.m. on September 20, 1980, uniformed Los Angeles Police Officers Osmond and Lane were patrolling on motorcycles when they received a radio broadcast that a taxicab had been stolen. The officers observed a taxicab matching the identification given, activated their red lights, and pursued the taxicab, which came to a stop. Officer Osmond

approached with his revolver drawn and said, "Freeze." The taxicab then accelerated, and the officers pursued it on motorcycles with their red lights and sirens activated. After the taxicab collided with a parked vehicle, defendant exited and ran down the street and along several driveways. The officers pursued on their motorcycles, but eventually reached a chain across the driveway in front of them. As Officer Lane prepared to dismount, defendant turned around and jammed a gun into the windshield of the officer's motorcycle. Officer Lane dropped the motorcycle, and defendant fell over the chain. Officer Lane fired three shots in his direction, but defendant stood up and ran back toward the taxicab. Officer Lane fired three more shots.

The officers gave chase on foot. Officer Osmond was in front and observed defendant appear to enter the door of a building. When Officer Osmond rounded the corner of the doorway, defendant was on the other side, facing and nearly touching the officer. When defendant and Officer Osmond fired their guns at one another, the officer was propelled backward 15 feet, temporarily losing consciousness. By this time Officer Lane had approached and defendant, who was pointing his weapon at Officer Osmond's upper body, swung the weapon toward Officer Lane, who grabbed defendant's weapon and struck him several times with the officer's own gun. As they wrestled over defendant's weapon, it discharged, hitting defendant in the jaw.

Defendant's weapon was determined to have discharged four rounds. Officer Osmond was hit by three of the bullets. Two bullets hit his police-issue bulletproof vest in the breast and rib cage area, and the third hit his belt buckle. He sustained serious bruising in these three areas. The police department extensively investigated the incident, and Officer Osmond was determined to be not at fault. Officer Osmond subsequently suffered depression and left the police force. Officer Lane received a departmental Medal of Valor.

A parole officer testified that in November 1984, defendant was released from prison on parole. On July 30, 1985, he violated the terms of his parole by hitting his girlfriend with a paddle during a fight over his contact with another woman. Defendant was released from custody on August 13, 1985. The parole officer examined defendant's "prison package" and testified that defendant generally had been confined in medium and maximum security facilities during his various stays in prison.[4]

Beverly Son testified that she was defendant's girlfriend at the time of the present murder. She had seen him with a handgun probably two weeks prior

---

[4]On cross-examination, the parole officer testified that defendant's behavior in prison was not ideal but was not bad. Defendant had no gang affiliations or major drug problems.

to the incident. She was with defendant on Sunday, December 1, 1985, and dropped him off early in the evening. When she met defendant the next day at her workplace, he appeared "quite a bit late" and stated that he had been up all night. Defendant told Son that he had been at a bar where there had been a shooting, that he did not "do it," but that the police probably would come after him because he was on "probation."

On October 20, 1986, during his incarceration on the present allegations, defendant was in the "pill module" of the county jail. Inmate Henry White observed defendant hit an inmate in the face or head, push the inmate to his knees, hold the inmate in a "full Nelson" headlock, and insert his erect penis in the inmate's rectum. The inmate appeared to have been forced into this activity. Defendant told White, "Get away from the front of the cell."

The jury fixed the penalty at death.

## II. Discussion

### A. Jury selection issues

#### 1. Hovey voir dire

■ Defendant contends that the trial court erred in utilizing a procedure for death-qualification voir dire of the jury that violated the instructions of this court in *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*) to isolate the prospective jurors during that phase of the voir dire.[5] According to defendant, the trial court's procedure restricted defense counsel's participation in *Hovey* voir dire, obliging the defense to make further death-penalty-related inquiry during the remainder of voir dire in open court. Defendant also contends that the trial court erred in conducting *Hovey* voir dire prior to the inception of the guilt phase.

Prior to jury selection, the trial court informed counsel for both parties that the court would conduct individual, in-chambers voir dire, initially asking each prospective juror five standardized questions: whether that individual (1) automatically would vote against a verdict of first degree murder or (2) automatically would vote against finding a special circumstance to be true, despite its being proved, in order to avoid having to decide

---

[5]Defendant's trial was held in 1988, prior to the passage in 1990 of Proposition 115, the Crime Victims Justice Reform Act, which modified, among other provisions, the statutory scheme governing voir dire in criminal cases. (*People v. Bemore* (2000) 22 Cal.4th 809, 834, fn. 14 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46] [Code Civ. Proc., § 223 abrogates requirement of *Hovey* that voir dire in capital cases be individualized and sequestered].)

the issue of the death penalty and having to discuss that issue with the other jurors; (3) was so much in favor of the death penalty as to vote automatically for that punishment without consideration of the evidence; (4) was so much against the death penalty as to vote automatically for life imprisonment without the possibility of parole without consideration of the evidence; and (5) had thoughts or feelings about the death penalty that would prevent him or her from being a fair and impartial juror and following the law. The trial court explained that it would restrict the prosecution and the defense each to three follow-up questions. The trial court advised counsel they might ask other questions of prospective jurors in open court.

The trial court's procedure did not violate the standards enunciated in *Hovey.* " 'The [sole] purpose of *Hovey* voir dire is to ascertain whether any prospective juror has such conscientious or religious scruples about capital punishment that his or her views would prevent or substantially impair adherence to the instructions and the juror's oath. [Citation.] The inquiry "seeks to determine only the views of the prospective jurors about capital punishment in the abstract, to determine if any, because of opposition to the death penalty, would 'vote *against* the death penalty without regard to the evidence produced at trial.' " [Citation.] However, "[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause." ' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 444-445 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

In the present case, the trial court did not limit the *Hovey* aspect of voir dire to examination by the court. (Cf. *People v. Bittaker* (1989) 48 Cal.3d 1046, 1083-1084 [259 Cal.Rptr. 630, 774 P.2d 659].) We have approved *Hovey* voir dire limited to questions by the trial court, with follow-up inquiry by defense counsel. (*People v. Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; see *People v. Tuilaepa* (1992) 4 Cal.4th 569, 586 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) In view of the circumstances that the trial court employed a procedure that automatically gave counsel three questions and frequently permitted counsel more than three questions, we cannot conclude that the procedure employed violated our requirement in *Hovey.*

Even assuming error in the present case, reversal is not required. In *People v. Bittaker, supra,* 48 Cal.3d 1046, 1085-1087, we rejected a reversible per se standard of review for such error. Defendant was at liberty to use the general voir dire to explore further the prospective jurors' responses to the facts and circumstances of the case. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005

[30 Cal.Rptr.2d 818, 874 P.2d 248].) Defendant has not established that any juror who eventually served was biased against him, and thus has not established prejudice arising from the procedure employed. (*People v. Avena*, *supra*, 13 Cal.4th 394, 413-414; *People v. Bittaker*, *supra*, 48 Cal.3d at pp. 1085-1087.)

The trial court also did not err in conducting *Hovey* voir dire prior to the guilt phase. In *Hovey*, we explained that "[t]he most practical and effective procedure available to minimize the untoward effects of death-qualification is individualized sequestered voir dire. Because jurors would then witness only a single death-qualifying voir dire—their own—each individual juror would be exposed to considerably less discussion and questioning about the various aspects of the penalty phase before hearing any evidence of guilt. Such a reduction in the pretrial emphasis on penalty should minimize the tendency of a death-qualified jury to presume guilt and expect conviction." (*Hovey*, *supra*, 28 Cal.3d 1, 80.) Thus, the *Hovey* procedure itself was adopted expressly in the expectation that, in general, death-qualification voir dire would be conducted prior to the guilt phase, and a defendant is not entitled to a new jury at the penalty phase merely to accommodate the death-qualification voir dire.

### 2. *Challenges for cause*

Defendant contends that the trial court erred in denying several of his challenges for cause, obliging him to employ peremptory challenges in order to excuse these prospective jurors. Defendant also contends that the trial court erred in granting several of the prosecutor's challenges for cause.

(3) A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would " 'prevent or substantially impair' " the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) " ' "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." [Citation.]' [Citation.] In addition, ' "[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." [Citations.]' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

In addition, in order to demonstrate that his or her right to a fair and impartial trial was affected by any error in the trial court's refusal to sustain the defendant's challenges for cause, a defendant must have employed a peremptory challenge to excuse the juror or jurors in question, exhausted the defendant's peremptory challenges or justified the failure to do so, and communicated to the trial court the defendant's dissatisfaction with the jury ultimately selected. (*People v. Ochoa, supra,* 19 Cal.4th 353, 444; *People v. Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Crittenden, supra,* 9 Cal.4th 83, 121-122.) " '[I]f he can actually show that his right to an impartial jury was affected because he was deprived of a peremptory challenge which he would have used to excuse a juror who sat on his case, he is entitled to reversal; he does not have to show that the outcome of the case itself would have been different. [Citations.]' " (*Crittenden,* at pp. 121-122.)

 As a threshold matter, defendant has not demonstrated that his right to a fair and impartial trial was affected by any error in the trial court's refusal to sustain defendant's challenges for cause, and he has suffered no prejudice from the trial court's actions. Defendant utilized peremptory challenges to excuse these prospective jurors. Defendant did not exercise all of his peremptory challenges, nor has he justified his failure to exercise them, and therefore he cannot establish that the selection of jurors would have been different had he not exercised his peremptory challenges against these prospective jurors. Nor did defendant express dissatisfaction to the trial court with the jury ultimately selected. In any event, as the following evidence indicates, no error appears in the denial of the defense challenges for cause.

a. *Denial of defense challenges*

The record discloses that the defense invited the prospective jurors to think of instances in which they believed the death penalty would be appropriate. Where the defense unsuccessfully challenged prospective jurors for cause, the prospective juror typically responded that the penalty would be appropriate in a fairly broad range of murder circumstances, but, when questioned by the prosecution whether he or she would be able to consider only the circumstances of the particular case, he or she responded affirmatively. As we shall explain, the trial court did not err in denying defendant's challenge for cause with regard to these jurors.

(1) *Prospective Juror Mc.*[6]

Questioned by the defense with regard to which circumstances she believed justified imposition of the death penalty, Prospective Juror Mc. stated

---

[6]The names of the prospective jurors have been abbreviated to protect their privacy.

initially that she would impose that punishment for any murder, including a murder that resulted from a quarrel or fight. Questioned further by the prosecution, Prospective Juror Mc. indicated that she would weigh the circumstances, and the penalty would depend upon the particular circumstances of the case. The trial court described a hypothetical situation involving substantial circumstances in aggravation and in mitigation. Prospective Juror Mc. indicated that she could weigh the circumstances in deciding the penalty. Given a hypothetical example of a killing involving provocation, she stated it was possible that a life sentence would be appropriate.

It is apparent that Prospective Juror Mc.'s responses originally reflected her views on the appropriate punishment when confronted with the general offense of murder. When given more specific examples, her views were not inflexible, but reflected a willingness to consider the particular circumstances in determining the appropriate penalty in a specific case. She did not express "views indicative of an unalterable preference in favor of the death penalty," such that her protestation that she would follow the law would not "rehabilitate" her. (*People v. Crittenden, supra*, 9 Cal.4th 83, 123; cf. *Morgan v. Illinois* (1992) 504 U.S. 719, 733-736 [112 S.Ct. 2222, 2232-2234, 119 L.Ed.2d 492].) Because her responses were conflicting, the trial court's determination as to her true state of mind is binding upon this court. (*People v. Jenkins, supra*, 22 Cal.4th 900, 987.)

### (2) *Prospective Juror L.*

Asked by defense counsel whether there were any circumstances in which the death penalty may be appropriate, Prospective Juror L. indicated that it might be appropriate in the case of premeditated murder. Asked whether a person convicted of first degree premeditated murder should receive the death penalty, he answered, "Probably." Asked whether he believed every first degree murder warrants the death penalty, he responded that it would depend upon the circumstances, but in general, "yes." Questioned by the prosecutor whether everyone who commits murder should receive the death penalty, Prospective Juror L. indicated he did not so believe. Asked whether the death penalty should be applied in the case of someone who commits murder in the course of a serious felony such as rape, robbery, or burglary, as he had stated with regard to premeditated murder, he responded: "No, it's not the same," and that all the facts should be considered. Asked whether he would follow the law if it was different from what he believed, he said, "Well, I have to. You have to obey the law. . . ." During general voir dire, he stated that he probably would believe the testimony of a police officer over that of another witness, but would not prejudge the testimony.

Prospective Juror L. stated an initial generalized opinion as to the type of case probably meriting the death penalty but subsequently expressed an

ability to consider the facts of the particular case, and an understanding that he would be required to, and would, follow the law. In *People v. Lucas* (1995) 12 Cal.4th 415, 480-481 [48 Cal.Rptr.2d 525, 907 P.2d 373], we concluded that the trial court did not err in denying the challenge for cause of a prospective juror who similarly indicated that she probably would vote for death in any case of multiple murder, but also promised to keep an open mind. To the extent Prospective Juror L.'s responses were conflicting, the trial court's determination of his true state of mind is binding upon this court. (*People v. Jenkins, supra,* 22 Cal.4th 900, 987.)

### (3) *Prospective Juror Q.*

Questioned by defense counsel whether the death penalty was appropriate for every proven murder, Prospective Juror Q. indicated that every first degree deliberate murder deserved the death penalty and she could not think "off-hand" of a circumstance in which life without possibility of parole would be appropriate for a proven first degree murder. Asked by the prosecutor whether she could follow the judge's instruction to examine defendant's life in considering punishment, she indicated, "I would hope so." Questioned further by the trial court, she indicated that her decision would not be automatic and she would think very carefully, consider the evidence on both sides, and listen to everything before making up her mind. This prospective juror expressed views indicating a broad, although not uniform, potential application of the death penalty, followed by views strongly indicating that she would consider the facts of the particular case and follow the law. (Cf. *People v. Lucas, supra,* 12 Cal.4th 415, 480.)

### (4) *Prospective Juror Le.*

Questioned by the defense as to which cases he believed warranted the death penalty, Prospective Juror Le. indicated that it might be appropriate in "predetermined" murder but not in every murder. He could envision situations in which life without possibility of parole was appropriate. Questioned by the prosecutor, Prospective Juror Le. stated he realized that the death penalty was not warranted in every murder case. During subsequent general voir dire when questioned about punishment, he stated that he would not favor any penalty and would want to hear all the evidence before making a decision. The record does not reflect that he had a bias in favor of the death penalty, merely from his response when asked to envision hypothetical, generalized situations in which it might be appropriate. He believed that life without the possibility of parole also was appropriate and understood that the circumstances of the case before him must be weighed and the penalty decided individually.

### (5) *Prospective Juror M.*

Questioned by defense counsel, Prospective Juror M. indicated he understood that he was not obligated to vote for the death penalty. Questioned whether he would consider both alternate punishments and vote for the sentence he felt was appropriate based upon his individual determination, he responded in the affirmative. Asked by the prosecutor how he felt about the death penalty, Prospective Juror M. stated it had a place in our society for "crime running rampant" and that "it's something we need." During general voir dire, he indicated that capital punishment was valid "in certain cases" when first degree murder was proven. Although he stated he was speculating, in such a case he was more apt to vote for the death penalty than for life imprisonment without the possibility of parole.

Prospective Juror M. exhibited a slight preference for the death penalty in first degree murder cases, but also indicated he would vote as the circumstances of the individual case warranted, and not that he would vote for the death penalty in general in such a case. (See *People v. Lucas, supra,* 12 Cal.4th 415, 480.) To the extent his responses were conflicting, the trial court's determination of his true state of mind is binding upon this court. (*People v. Jenkins, supra,* 22 Cal.4th 900, 987.)

### b. *Grant of prosecutorial challenges*

Defendant also contends that the trial court improperly sustained several of the prosecutor's challenges for cause to prospective jurors who exhibited reluctance to vote for the death penalty but who also indicated that they would follow the law and were not invariably opposed to the penalty. Defendant contends that, as a result, the jury panel had a predominance of pro-death jurors.

### (1) *Prospective Juror K.*

Prospective Juror K. demonstrated his hostility to the death penalty in the course of the initial *Hovey* questioning by the trial court. Asked whether he would refuse to find defendant guilty or to find a special circumstance true in order to avoid having to discuss the death penalty with the other jurors, Prospective Juror K. indicated that he was extremely uneasy about this subject and did not believe he could cope with voting in favor of the death penalty. Asked whether he had any opinion about the death penalty that would prevent him from being a fair and impartial juror and following the law, he responded that sending anybody "to the death penalty" would bother him. The trial court asked whether, if defendant were proven guilty, Prospective Juror K. could discuss the death penalty with the other jurors and

state that although he did not want to impose it, the facts of the case warranted that punishment. The prospective juror responded that he did not know but also indicated that he could follow the law.

Questioned by defense counsel whether he could consider the death penalty and whether he could conceive of circumstances so egregious that the death penalty would be appropriate, Prospective Juror K. stated that he did not know. Questioned by the prosecutor whether he thought it would be difficult to be a juror in the present case, given his views, he stated that it would. Asked by the trial court whether he could look at defendant and inform him that he had decided defendant should die, Prospective Juror K. responded, "No." Asked by the defense whether he could vote for death if the facts established guilt, Prospective Juror K. stated that he did not want to go through it, and asked to be placed on another trial and taken "away from this."

It is readily apparent that Prospective Juror K.'s views in opposition to the death penalty would " 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Crittenden, supra*, 9 Cal.4th 83, 121.) The trial court did not err in granting the prosecutor's challenge for cause.

(2) *Prospective Juror G.*

Questioned by defense counsel whether he could think of any circumstances in which someone deserved the death penalty, Prospective Juror G. could not think of any. He indicated he could handle the task of deciding whether defendant lived or died, and could look him in the eye and tell defendant he had to die. Questioned by the prosecutor whether he would vote in an election to instate the death penalty, Prospective Juror G. initially indicated he did not know and subsequently indicated that perhaps he would not vote in favor of it. Asked how he felt about the death penalty, Prospective Juror G. did not want anyone to die, but might feel differently if the victim were a family member. Asked whether, presuming defendant had been found guilty of murder and the evidence demonstrated defendant's bad life, he could state that he believed defendant should die, Prospective Juror G. did not think so. He agreed when the prosecutor stated that the juror had indicated both that he could and could not vote for the death penalty.

The trial court did not err in granting the prosecutor's challenge for cause. The court determined that the prospective juror was "extremely indecisive" on the death penalty. The only possible circumstance that he thought deserved the death penalty was when the victim was a family member. That

possibility did not establish his ability to follow the law. (Cf. *People v. Wader* (1993) 5 Cal.4th 610, 652-653 [20 Cal.Rptr.2d 788, 854 P.2d 80] [prospective juror properly excused who was opposed to death penalty but possibly could apply it in the event the victim were a family member or close friend]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1061-1062 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [prospective juror properly excused who could not imagine applying death penalty in any circumstance].)

### (3) *Prospective Juror Ni.*

In response to the standard *Hovey* questions, this prospective juror told the court that she believed in the death penalty and would like to see it applied more often but was not certain whether personally she could vote for it. Asked by the prosecutor to state whether she could look defendant in the eye and tell him she had voted for death, she did not know whether she could carry out that responsibility. Asked whether she could carry out her duty as a juror in this case, Prospective Juror Ni. did not believe she could, would not "be good on the jury at all," and would have a problem being impartial. Despite believing in the death penalty, she could not put someone to death.

Although both prosecution and defense counsel passed for cause, on its own motion the trial court excused this juror on the basis that she was very confused and believed in the death penalty without being able to apply it herself. The trial court properly excused the prospective juror on the basis that she could not personally impose the death penalty despite viewing it as an appropriate punishment. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1147 & fns. 51 & 52 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Visciotti* (1992) 2 Cal.4th 1, 44-46 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

### (4) *Prospective Juror Sp.*

Asked the standard *Hovey* question whether he would not vote for a special circumstance finding in order to avoid discussing the death penalty, Prospective Juror Sp. told the court that he would disregard any special circumstance that was based merely upon the status of the victim, such as a police officer. Questioned whether he had any opinions that would prevent his being fair and impartial or his following the law, he answered, "Possibly," and explained he could vote to impose the death penalty only if he believed that it served to benefit society, rather than merely because the law directed that penalty. Asked whether he was willing to be a juror in the case, Prospective Juror Sp. stated he could not answer.

Asked by defense counsel whether he could vote for the death penalty if a defendant had broken into a residence, killed the husband, raped the wife,

and repeated those offenses against five or six additional families, Prospective Juror Sp. stated, "Not right now." Defense counsel suggested being a juror in a death penalty case would make a juror responsible for the life or death of a person, and this prospective juror stated he was not prepared to do that. Asked by the prosecutor whether he could vote for death if he among the 12 jurors were the final vote for death, Prospective Juror Sp. indicated he was tempted to say, "I just plain can't do it because I can't come up with an answer." Over defense objection, on its own motion the trial court excused the prospective juror because he did not appear capable of making a decision in such a case.

It is apparent that Prospective Juror Sp. was not prepared to impose the death penalty and was undecided as to his ability to do so. (Cf. *People v. Cain* (1995) 10 Cal.4th 1, 60-61 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [juror properly excused for cause who did not know whether she could vote for the death penalty].) The trial court did not err in excusing this prospective juror.

(5) *Prospective Juror B.*

During the trial court's *Hovey* questioning, Prospective Juror B. indicated that she would refuse to find defendant guilty of first degree murder and would refuse to find any special circumstances to be true, in order to avoid having to discuss the death penalty with the other jurors. Asked whether she was so much against the death penalty that she would not pay any attention to the evidence and automatically would vote in favor of life imprisonment without possibility of parole, she indicated she probably would do so. Questioned whether she would be able to follow the law and the evidence and make a decision as instructed, pursuant to her obligation under the law, she did not know. Asked whether she believed that one human being did not have the right to take the life of another human being, she responded, "Exactly." She tentatively agreed with the prosecutor that her views would substantially prevent her from being a fair juror and agreed she would find it nearly impossible to perform her duty as a juror in such a case. Asked by defense counsel whether she could think of any murder case in which the death penalty would be appropriate, she answered in the negative.

Prospective Juror B.'s responses indicate strongly that she did not consider the death penalty to be an option in sentencing. (Cf. *People v. Cain, supra,* 10 Cal.4th 1, 61 [juror properly excused for cause who could not conceive of a case in which he would vote for death penalty].) The trial court did not err in excusing her for cause.

## B. *Guilt phase issues*

### 1. *Charge of firearm possession with a prior felony conviction*

#### a. *Nonseverance of count revealing prior felony*

Defendant contends that the trial court erred in failing to sever count V, in violation of his state law rights and of his federal constitutional rights, under the Sixth and Fourteenth Amendments, to due process of law and to a fair and impartial jury. In count V, defendant was charged with being a felon in possession of a firearm. (§ 12021, subd. (a).) Following the *Hovey* voir dire and prior to the selection of the jury panel, the trial court read the charges, including that count, to the prospective jurors. Following selection of the jury and prior to presentation of testimony, defendant moved to have count V tried separately from the other counts, suggesting that that count be tried to the court. The prosecutor declined to waive jury trial on that count. Defendant indicated he would stipulate to having suffered the prior felony conviction of assault, within the meaning of the allegation in count V, although without specifying the nature of the felony.

Accordingly, at the close of the prosecution's case and in the jury's presence, the prosecutor inquired of defendant whether he would stipulate that on August 6, 1976, he had been convicted of a prior felony. The defense requested a bench conference, at which it pointed out that defendant had been convicted of second degree murder, not assault, on that date. In the presence of the jury the prosecution corrected the date to January 30, 1981, and defense counsel stipulated that defendant had suffered a prior felony on that date. Defendant moved for a mistrial based upon that exchange. The motion was denied.

We have recognized that if the jury is permitted to learn of a defendant's prior conviction, it may be disposed to lean toward a determination of guilt in the current proceedings. (*People v. Calderon* (1994) 9 Cal.4th 69, 75 [36 Cal.Rptr.2d 333, 885 P.2d 83].) Accordingly, the trial of an allegation concerning a defendant's prior conviction generally is bifurcated from that of other current charges. (*Id.* at pp. 75-76.) "Perhaps the most common situation in which bifurcation of the determination of the truth of a prior conviction allegation is *not* required arises when, even if bifurcation were ordered, the jury still would learn of the existence of the prior conviction before returning a verdict of guilty. For example, when the existence of the defendant's prior offense otherwise is admissible to prove the defendant committed the charged offense—because the earlier violation is an element of the current offense [citations] . . . ." (*Id.* at p. 78.)

This court decided in *People v. Hall* (1980) 28 Cal.3d 143, 153-157 [167 Cal.Rptr. 844, 616 P.2d 826] that when a prior conviction is pertinent only to ex-felon status as an element of a currently charged offense, and the defendant stipulates that he or she is an ex-felon, the jury may not learn either the fact of or the nature of the prior conviction. In *People v. Valentine* (1986) 42 Cal.3d 170, 173 [228 Cal.Rptr. 25, 720 P.2d 913], however, we held that *Hall* had been abrogated by California Constitution, article I, section 28, subdivision (f), which provides: "When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court." We concluded that although the jury was not entitled to learn the nature of the prior conviction, it "must be advised that defendant is an ex-felon where that is an element of a current charge." (*People v. Valentine, supra,* 42 Cal.3d at p. 173; *People v. Calderon, supra,* 9 Cal.4th 69, 78, fn. 4; see *People v. Bouzas* (1991) 53 Cal.3d 467, 476-477 [279 Cal.Rptr. 847, 807 P.2d 1076].)

In the present case, therefore, the trial court did not abuse its discretion in denying defendant's request for a mistrial. (*People v. Jenkins, supra,* 22 Cal.4th 900, 985-986.) The jury did not learn the nature of the prior offense. The circumstance that the prosecution referred to the incorrect date of the prior offense, to which defendant had stipulated, did not necessarily alert the jury that there was more than one prior conviction.

Defendant also contends that the trial court erred in denying his motion to sever count V.[7] Although defendant initially moved to sever, he subsequently agreed to stipulate to his ex-felon status as to that count, from which we may presume he intended to withdraw the motion for severance. Even if defendant did not so intend, his failure to press for a ruling waives the issue on appeal. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 931 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

In any event, the trial court would not have erred in denying the motion. Section 954 provides that an accusatory pleading may charge two or more different offenses connected together in their commission. The firearm used to commit the offenses was the same, and joinder was proper pursuant to that statute. Whether offenses properly are joined pursuant to section 954 is a question of law and is subject to independent review on appeal; the decision whether separate proceedings are required in the interests of justice is reviewed for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th

[7]Defendant was tried prior to the effective date of Proposition 115, and accordingly we apply the law predating that proposition (see Cal. Const., art. I, § 30, subd. (a); § 954.1) in our review of defendant's claims regarding severance. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314, fn. 13 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Arias* (1996) 13 Cal.4th 92, 126, fn. 7 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

155, 188 [58 Cal.Rptr.2d 385, 926 P.2d 365]; see *People v. Gomez* (1994) 24 Cal.App.4th 22, 27 [29 Cal.Rptr.2d 94] [standard of review, in cases joining counts involving current offense in which firearm is used with offense in which that firearm is possessed by individual previously convicted of a felony, is whether there has been an abuse of discretion].)

In *People v. Valentine, supra,* 42 Cal.3d 170, 179-180, footnote 3, we noted that "[w]hen the joinder statute (§ 954) would otherwise permit consolidation of charges, a trial court should, if requested, carefully exercise its discretion whether to try an ex-felon count separately 'in the interests of justice.' Insofar as the particular facts are known pretrial, the court must balance the legitimate benefits, judicial and prosecutorial, of a consolidated trial against the likelihood that disclosure of ex-felon status in a joint trial will affect the jury's verdict on charges to which that status is irrelevant."

Nonetheless, the burden is on the party seeking severance to establish clearly that a substantial danger of prejudice exists requiring that the charges be tried separately. (*People v. Bradford, supra,* 15 Cal.4th 1229, 1315.) Denial of a severance may be an abuse of discretion where (1) evidence related to the crimes to be tried jointly would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case"; and (4) any one of the charges carries the death penalty. (*Bradford,* at p. 1315; *People v. Mayfield* (1997) 14 Cal.4th 668, 721 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Memro* (1995) 11 Cal.4th 786, 849-850 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *Williams v. Superior Court* (1984) 36 Cal.3d 441, 452-454 [204 Cal.Rptr. 700, 683 P.2d 699].) The first criterion is most significant because, if evidence on each of the joined charges would have been admissible in a separate trial on the other, " 'any inference of prejudice is dispelled.' " (*People v. Bradford, supra,* 15 Cal.4th at pp. 1315-1316; *People v. Balderas* (1985) 41 Cal.3d 144, 171-172 [222 Cal.Rptr. 184, 711 P.2d 480]; see *People v. Mayfield, supra,* 14 Cal.4th at p. 721.)

Because complete cross-admissibility is not necessary to justify the joinder of counts (*People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1]), in the present case the cross-admissible evidence concerning the gun would justify such joinder. (*People v. Gomez, supra,* 24 Cal.App.4th 22, 27-28.) The count alleging that defendant possessed a firearm as an ex-felon is not unusually inflammatory or prejudicial. (See *People v. Marquez* (1991) 1 Cal.4th 553, 573 [3 Cal.Rptr.2d 710, 822 P.2d 418].) Nor did the joinder append a weak case to a strong one, or combine two noncapital cases into a capital case. (See *People v. Bradford, supra,* 15 Cal.4th 1229, 1315; *People v. Memro, supra,* 11 Cal.4th 786, 850;

*Williams v. Superior Court, supra,* 36 Cal.3d 441, 452-454.) The trial court did not abuse its discretion in not severing count V.

In addition, we note that pursuant to defendant's special instructions, the jury specifically was instructed not to consider defendant's status as a felon in considering the evidence of the other charges against him, and not to speculate as to the type of felony he had incurred. Any possible error was harmless.

### b. *Waiver of jury trial as to prior felony conviction allegation*

Defendant contends that the trial court erred in permitting him to stipulate to having suffered a prior felony conviction without the court's obtaining a prior waiver of defendant's constitutional rights pursuant to *Boykin v. Alabama* (1969) 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274], and *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]. We recently addressed the identical argument in *People v. Newman* (1999) 21 Cal.4th 413 [87 Cal.Rptr.2d 474, 981 P.2d 98]. In that decision, we relied upon the rationale that when a defendant has asserted and has been afforded his or her right to trial, has waived none of his or her constitutional rights, but has elected to stipulate to one but not all of the evidentiary facts necessary to a conviction of an offense or to a finding that an enhancement allegation is true, the concerns of voluntariness prompting the *Boykin* holding are not present. We concluded "that the trial court was not required to provide the *Boykin-Tahl* advisements before permitting defendant, through his counsel, to stipulate during his trial for possession of a firearm by a felon· that he previously had been convicted of a felony. [Citations.]" (*People v. Newman, supra,* 21 Cal.4th at p. 422, fn. omitted.) Accordingly, in the present case, the trial court did not err in not giving the *Boykin-Tahl* advisements prior to defendant's stipulation that he previously had been convicted of a felony.

### 2. *Defendant's shackling during trial*

Defendant contends that the trial court erred in ordering that defendant be shackled. This court has held that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People v. Hawkins* (1995) 10 Cal.4th 920, 943-944 [42 Cal.Rptr.2d 636, 897 P.2d 574].) A defendant's record of violence, or the circumstance that he or she is a capital defendant, does not by itself justify shackling. (*Hawkins,* at p. 944; *People v. Duran, supra,* 16 Cal.3d at p. 293.)

■ The decision of a trial court to shackle a defendant will be upheld by a reviewing court in the absence of an abuse of discretion. (*People v. Medina* (1995) 11 Cal.4th 694, 731 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Pride* (1992) 3 Cal.4th 195, 231-232 [10 Cal.Rptr.2d 636, 833 P.2d 643].) When the record does not reflect "violence or a threat of violence or other nonconforming conduct" by the defendant, a trial court's order imposing physical restraints will be deemed to constitute an abuse of discretion. (*People v. Duran, supra*, 16 Cal.3d at p. 291; *People v. Jenkins, supra*, 22 Cal.4th 900, 995.)

■ In the present case, following commencement of the trial and testimony by the first three witnesses and outside the presence of the jury, defense counsel sought permission to have defendant excused from the proceedings for an hour in order to sleep because, upon discovery the previous evening that defendant was in possession of a handcuff key, defendant had been kept awake, apparently for questioning on that matter. In the course of discussion between the court and counsel it was observed that the courtroom was not equipped with a lock on the door to prevent any escape attempt, and the bailiff at times had to turn away from defendant when preoccupied with various tasks. The trial court inquired of the bailiff, who reported that the "sergeant downstairs" preferred that defendant be shackled with leg irons. The trial court ordered that "leg restraints will be permitted."

Defense counsel objected on the basis that the trial court had made the order without holding any hearing on the matter. The trial court initially performed a visual test, by having a shackle placed upon defendant's leg and sitting in each of the juror chairs in the front row. The court determined that the chain was visible only from one chair and ordered that the chain and shackles be placed behind defense counsel's briefcase to impede the observation by that juror.

The trial court then held a hearing. The deputy sheriff assigned to monitor prisoners being transported to the central jail in the evening testified that he had received a tip from another inmate riding the bus with defendant that morning, who had observed defendant locking and unlocking his handcuffs. The deputy sheriff conducted a search and retrieved a handcuff key placed inside a candy wrapper included with other candy in a plastic bag within a red cardboard briefcase in defendant's possession.

Defendant testified that the previous morning, he had carried the plastic bag containing candy bars and cigarettes with him to court, leaving the bag in the holding cell with other prisoners to offer those items for sale. At the

noon recess, he returned to the holding cell and found two candy bars had been sold. Before returning to the courtroom he was strip-searched. At the end of the day, when transported on the bus, he was handcuffed in such a manner that another inmate had to carry the bag. That evening at the jail, the deputy sheriff searched defendant and discovered the handcuff key. The trial court ordered that one of defendant's ankles be shackled to one arm of his chair.

In subsequent proceedings, defense counsel noted for the record several times that when defendant shifted position, the jurors could hear his chains, and that when defendant walked across the room with chains clanking, several jurors observed the scene. As part of the jury instructions, the trial court advised the jurors that they could not discuss or consider defendant's restraints and that no connotation of guilt arose from the presence of such restraints.

The trial court did not abuse its discretion. Although, as the trial court recognized, defendant had not acted in a violent manner during his prior courtroom appearances, a trial court properly may order the imposition of restraints when there is evidence of "other nonconforming conduct." (*People v. Duran, supra,* 16 Cal.3d 282, 291.) The trial court implicitly found that defendant had deliberately rather than inadvertently obtained a key to his handcuffs, indicating he might attempt to escape. That circumstance, together with the circumstance that the courtroom assigned for trial was not equipped with a lock, support the trial court's finding that restraints during courtroom sessions were necessary. (See *People v. Stankewitz* (1990) 51 Cal.3d 72, 95-97 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Sheldon* (1989) 48 Cal.3d 935, 945-946 [258 Cal.Rptr. 242, 771 P.2d 1330].)

The trial court also did not err in instructing the jury not to consider the restraints. In *People v. Duran, supra,* 16 Cal.3d at pages 291-292, we advised that such instruction should not be given if the restraints have been concealed, unless the defendant so requests, because the instruction tends to draw attention to the very circumstance not to be considered by the jury. In the present case, however, the instruction was requested by the defendant, and it appears that several jurors may have become aware that some form of restraint was being employed. In view of that circumstance, the court was prudent to instruct on that assumption, rather than to assume the jurors were completely unaware of the restraints.

Even assuming the trial court erred, however, there was no prejudice. Brief glimpses of a defendant in restraints have not been deemed prejudicial. (*People v. Tuilaepa, supra,* 4 Cal.4th 569, 584-585; *People v. Duran, supra,*

16 Cal.3d 282, 287, fn. 2.) The record suggests that some members of the jury had glimpses of defendant's leg shackle, rather than protracted viewing of him in more extensive chains.

### 3. *Photographic and eyewitness identification*

 Defendant contends that the trial court, by admitting Cebreros's testimony identifying defendant as the person who committed the offenses, violated defendant's federal constitutional right to due process of law. Defendant maintains that Cebreros's initial identification was based upon an impermissibly suggestive photographic lineup, and his subsequent in-court identification of defendant was based upon the earlier improper identification.

Defendant challenged the photographic identification only following the prosecutor's case-in-chief, as part of a motion for a judgment of acquittal pursuant to section 1118.1 on the basis of insufficiency of the evidence, attacking Cebreros's credibility in part because of the "suggestive photo line-up" utilized by the police. Defendant's failure to assert a timely objection results in a waiver of the issue. (Evid. Code, § 353; *People v. Medina, supra*, 11 Cal.4th 694, 753; see *People v. Zapien* (1993) 4 Cal.4th 929, 979 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

Even if we were to overlook the untimeliness of defendant's objection and deem the section 1118.1 motion adequate to preserve the issue, however, we would conclude that Cebreros's identification of defendant was properly admitted. In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107, 114 [97 S.Ct. 2243, 2247-2249, 2253, 53 L.Ed.2d 140]; *Neil v. Biggers* (1972) 409 U.S. 188, 199-200 [93 S.Ct. 375, 382-383, 34 L.Ed.2d 401]; *People v. Ochoa, supra*, 19 Cal.4th 353, 412; *People v. Johnson* (1992) 3 Cal.4th 1183, 1216 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251].)

The defendant bears the burden of demonstrating the existence of an unreliable identification procedure. (*People v. Ochoa, supra*, 19 Cal.4th 353,

412; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

 Defendant urges that among the six individuals depicted in the photographic lineup, his photograph, placed in the center of the top row, is the only one in which the subject had three of the features noted by the eyewitnesses—glasses, a goatee, and a suit and tie. We have examined the photographic lineup and observe that all six men are wearing glasses; at least one of the other men is dressed in a three-piece suit, and another is wearing a suit jacket. All of the men have a mustache and some have other facial hair. Several have a hairstyle similar to that of defendant. Defendant was not the tallest, shortest, oldest, or youngest of the participants. His photograph was similar to that of the others. (*People v. Carpenter, supra*, 15 Cal.4th 312, 367.)

Moreover, there must be a "substantial likelihood of irreparable misidentification" under the " ' "totality of the circumstances" ' " to warrant reversal of a conviction on this ground. (*Manson v. Brathwaite, supra*, 432 U.S. 98, 104-107 [97 S.Ct. 2243, 2247-2249].) In the present case, there is no substantial likelihood that Cebreros misidentified defendant when he viewed the six photographs. Cebreros had had an opportunity while in the Pair of Aces bar to notice defendant, who was dressed distinctively. When outside, Cebreros had an opportunity to view defendant for several minutes before defendant shot Treto and Cebreros started to run. Cebreros described defendant to the police at the hospital following the shooting. Prior to examining the photographs, Cebreros was instructed that he was not to assume the person who committed the crime was pictured therein, that it was equally important to exonerate the innocent, and that he had no obligation to identify anyone. Without equivocation, Cebreros identified defendant as the man who had shot him. Defendant has not met his burden of establishing unreliability in the totality of the circumstances under federal constitutional standards.

### 4. *Motion to exclude defendant's statements*

 Defendant contends that the trial court erred in admitting Officer Baroni's testimony describing his postarrest interrogation of defendant because, prior to questioning, defendant unequivocally requested that he be allowed to speak to an attorney. Defendant contends that his statements were obtained in violation of his privilege against self-incrimination, right to due

process of law, and right to the assistance of counsel, under the Fifth, Sixth, and Fourteenth Amendments.

Prior to the testimony of Officer Baroni, defendant moved to exclude the statements made by defendant while in custody following his arrest. The trial court held a hearing pursuant to Evidence Code section 402. Officer Baroni testified that on December 16, 1985, with Officer Gallon present, he spoke to defendant in an interview room in the police department. Officer Baroni did not make any promises or threats to defendant in order to persuade him to speak to the officers.

Officer Baroni read to defendant the *Miranda* advisements, including his right to have an attorney present, and asked whether defendant understood those rights, and defendant responded, "Yes." Officer Baroni inquired whether, having those rights in mind, defendant wished to waive his rights and answer questions or make a statement. Defendant told the officer: "I want to have an attorney present. I will talk to you now until I think I need one. I don't need one present at this time." The officer asked whether defendant wanted to talk to an attorney or wanted to talk to the officer without an attorney. Defendant told the officer: "I'll talk to you until I think I need an attorney." The officer again asked whether defendant wanted to talk to the officer with an attorney present or without an attorney present. Defendant told the officer: "I'll talk to you now without an attorney present. I'll ask for one when I think I need one." The officer wrote down each question and answer. Defendant examined the form recording this exchange, initialed each answer after it was written down, and executed the waiver form.

On cross-examination Officer Baroni explained that the conversation was not audiotaped or videotaped. Defense counsel inquired whether the officer indicated that if defendant wanted an attorney the officer could not question him, and whether the officer inquired further about defendant's request for an attorney. The officer stated he did not recall, then explained that he may have said, "If you want an attorney, we could have one here present here [*sic*] with you," following which defendant responded that "I'll talk to you without an attorney present now until I get one." Asked whether there may have been some conversation between defendant's initial statement that he wanted to have an attorney present and his second statement that he would talk to the officers now until he thought that he needed an attorney, Officer Baroni stated, "There may have been."

Defendant testified, on the other hand, that on the morning of the interview, he had taken "Zantax," a prescription drug prescribed to alleviate his pancreatitis. At the time of the interview, he was drowsy from its effects.

Defendant was informed of his rights and requested an attorney. Officer Baroni indicated to defendant that Baroni did not truly believe defendant had committed the offenses and wanted to help him. Defendant then indicated he would talk to the officer.

The trial court stated that "Equivocality, like beauty, is in the eye of the beholder. . . . [¶] I don't get all this hiatus between 'I want an attorney, but I'll talk to you now until I feel I need one.'" The trial court ruled that defendant properly was advised of and waived his constitutional rights.

 In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained. (*People v. Mayfield, supra,* 14 Cal.4th 668, 733; *People v. Crittenden, supra,* 9 Cal.4th 83, 128.)

 The privilege against self-incrimination provided by the Fifth Amendment of the federal Constitution is protected in "inherently coercive" circumstances by the requirement that a suspect not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel. (*Miranda, supra,* 384 U.S. 436, 444-445, 473-474 [86 S.Ct. 1602, 1612-1613, 1627-1628]; see *Dickerson v. United States, supra,* 530 U.S. 428, 439-440 [120 S.Ct. 2326, 2333-2334]; *People v. Crittenden, supra,* 9 Cal.4th 83, 128; *People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992].) "If a suspect indicates 'in any manner and at any stage of the process,' prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 444-445 . . . ; *id.* at pp. 470, 472-474, 477-479 [citations].)" (*People v. Crittenden, supra,* 9 Cal.4th at pp. 128-129, italics omitted.)

A suspect, having invoked these rights, is not subject to further interrogation by the police until counsel has been made available to him or her, unless the suspect personally "initiates further communication, exchanges, or conversations" with the authorities. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378] (*Edwards*); *People v. Crittenden, supra,* 9 Cal.4th at p. 128; *People v. Sims, supra,* 5 Cal.4th at p. 440; see also *McNeil v. Wisconsin* (1991) 501 U.S. 171, 176-177 [111 S.Ct. 2204, 2207-2209, 115 L.Ed.2d 158]; *Arizona v. Roberson* (1988) 486 U.S. 675, 680-682 [108 S.Ct. 2093, 2097-2098, 100 L.Ed.2d 704].) If a suspect

invokes these rights and the police, in the absence of any break in custody, initiate a meeting or conversation during which counsel is not present, the suspect's statements are presumed to have been made involuntarily and are inadmissible as substantive evidence at trial, even in the event the suspect executes a waiver and despite the circumstance that the statements would be considered voluntary under traditional standards. (*McNeil v. Wisconsin, supra*, 501 U.S. at pp. 176-177 [111 S.Ct. at pp. 2207-2209].)

The rule of *Edwards* "applies only when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. [Citation.] It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." (*McNeil v. Wisconsin, supra*, 501 U.S. at p. 178 [111 S.Ct. at p. 2209], italics omitted; *People v. Crittenden, supra*, 9 Cal.4th at p. 129.) The suspect must unambiguously request counsel. (*Davis v. United States* (1994) 512 U.S. 452, 458-459 [114 S.Ct. 2350, 2354-2355, 129 L.Ed.2d 362]; *Smith v. Illinois* (1984) 469 U.S. 91, 97-98 [105 S.Ct. 490, 493-494, 83 L.Ed.2d 488].)

Following the adoption of article I, section 28, subdivision (d) of the California Constitution, we have applied federal standards in reviewing a defendant's claim that his or her statements were elicited in violation of *Miranda*. (*People v. Sims, supra*, 5 Cal.4th 405, 440.)

In the present case, defendant's initial statement was an unambiguous request for counsel. (*Davis v. United States, supra*, 512 U.S. 452, 459 [114 S.Ct. 2350, 2355].) Accordingly, defendant was not subject to further interrogation by the police until counsel was made available to him. (*Edwards, supra*, 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1884-1885].) "Interrogation" consists of express questioning, or words or actions on the part of the police that "are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [100 S.Ct. 1682, 1689-1690, 64 L.Ed.2d 297], fns. omitted; *People v. Clark* (1993) 5 Cal.4th 950, 985 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) "The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*Clark*, at p. 985; *U.S. v. Foster* (9th Cir. 2000) 227 F.3d 1096, 1101-1104].)

Here the officer testified that between defendant's initial invocation of the right to counsel, and his subsequent statement that he would talk to the officers until he "got one" or "needed one," the officer may have restated that in the event defendant wished to have an attorney present, the police could accommodate him. Such a statement by the officer would not in

any manner call for an incriminating response. (*Rhode Island v. Innis, supra,* 446 U.S. 291, 301 [100 S.Ct. 1682, 1689-1690].) Following the officer's comment, defendant advised that he would talk until "I get one." In *People v. Clark* (1992) 3 Cal.4th 41, 120 [10 Cal.Rptr.2d 554, 833 P.2d 561], where the defendant similarly stated that he wanted an attorney to get " 'that process started,' " but was willing to talk to the police in the interim, we held that the defendant's indication that he desired to have an attorney present at some future point was not an invocation of the right to counsel requiring the cessation of interrogation. (See also *People v. Marshall* (1990) 50 Cal.3d 907, 925-926 [269 Cal.Rptr. 269, 790 P.2d 676] [holding the *Edwards* rule was not violated where the defendant requested an attorney, then initiated further conversation without intervening comments by the officers].) We conclude that substantial evidence supports the trial court's determination that defendant waived his right to counsel.

Even if we were to assume that the evidence *was* obtained in violation of *Miranda,* we would conclude under the circumstances of the present case that its admission was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [111 S.Ct. 1246, 1265, 113 L.Ed.2d 302]; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People v. Cahill* (1993) 5 Cal.4th 478, 509-510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) The jury may have considered defendant's statements as evidence that he was present at the bars on the night of the murder, but the jury was able to consider the same evidence in far greater detail through the testimony of several other witnesses. Although the jury may have considered that defendant had made several statements to the police that were inconsistent with the accounts of other witnesses concerning his choice of alcoholic beverage, his socialization while at the bar, and the time he departed, the statements at most revealed defendant's general lack of veracity. They were not inculpatory and did not contribute to defendant's conviction in light of the entire record. (See *Arizona v. Fulminante, supra,* 499 U.S. at p. 309 [111 S.Ct. at p. 1265].) Although the jury may have considered defendant's other statements concerning his work history and prior conviction record, which also may have cast doubt on defendant's veracity, that evidence was collateral to the issues at trial. We conclude that the admission of this evidence was harmless beyond a reasonable doubt.

### 5. *Trial court's rulings*

Defendant contends the trial court made several rulings as to the relevance of certain subjects, proposed by defense counsel during their examination of witnesses, that precluded counsel from developing facts to refute the prosecution's case. Defendant asserts that, as a result, he was prevented from

impugning the credibility of the chief prosecution witness and from suggesting that defendant did not commit some or all of the crimes.

■ The rules regarding the admissibility of evidence are well established. Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.] The trial court retains broad discretion in determining the relevance of evidence." (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Hart* (1999) 20 Cal.4th 546, 606, fn. 16 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

■ Defendant initially complains that the trial court improperly prevented defense counsel from cross-examining Cebreros regarding Cebreros's and Treto's involvement in gambling activities at the bar and their relationship preceding the incident. Defense counsel questioned the witnesses concerning their shared interest in playing pool. Following objection by the prosecution, defense counsel explained he wished to pursue that line of questioning in order to establish that Cebreros and Treto had a close personal relationship that gave Cebreros a motive to embellish his account of the events. Defense counsel also wished to establish that the two men had participated in a high-stakes gambling tournament at the Pair of Aces two days earlier that may have motivated other participants or onlookers to steal Treto's money, and that gambling also had occurred at that bar on the night of the murder. The trial court ruled that only evidence regarding gambling on the night of the murder itself was relevant, pointing out that gambling may have lured defendant to the area. Defense counsel, however, refrained from pursuing that line of inquiry.

The trial court did not abuse its discretion in precluding questioning regarding the shared interest in playing pool as a means of showing a personal relationship between Cebreros and Treto. Cebreros's testimony otherwise established that he had known Treto for some time, that Cebreros's brother Favio was residing at Treto's residence, and that Favio and Cebreros had employment similar to Treto's, demonstrating that a personal relationship existed between the two men. To the extent such evidence would establish that Cebreros was personally biased against defendant, that circumstance already would have been evident to the jury from his testimony that defendant had attempted to kill him. (See *People v. Dyer* (1988) 45 Cal.3d 26, 48 [246 Cal.Rptr. 209, 753 P.2d 1].)

Similarly, the trial court did not abuse its discretion in precluding questioning, regarding Treto's participation in a pool tournament several days

earlier, designed to suggest that others had a motive to commit the offenses against Treto. "[E]vidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. [Citations.]" (*People v. Bradford, supra,* 15 Cal.4th 1229, 1325; see *People v. Davis* (1995) 10 Cal.4th 463, 501 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Defense counsel's allusions to the possibility that, as a result of Treto's earlier participation in high-stakes pool tournaments, unnamed individuals might have committed these offenses, is inadequate to meet that standard.

■ Defendant next contends that the trial court improperly prevented defense counsel from eliciting testimony regarding narcotics activities at the Pair of Aces bar. In fact, defense counsel was permitted to ask Cebreros whether he had used cocaine that night, whether he ever used cocaine with Treto, and whether he had observed Treto use cocaine that night in or outside the bar or behave as if under the influence of cocaine. Cebreros responded in the negative. Defense counsel subsequently inquired whether Cebreros "was completely unaware of narcotics activities" at the bar, and the trial court sustained the prosecutor's objection. Without objection, defense counsel then asked whether Cebreros had observed any activity involving cocaine at the bar.

The record simply does not reflect that defense counsel was prevented from inquiring about narcotics activity or Cebreros's or the victim's involvement in such activity. The ruling of the trial court challenged by defendant was appropriate in light of the manner in which the foregoing question was phrased, and defense counsel otherwise was permitted to develop this line of inquiry.

■ Next, defendant maintains that the trial court improperly prevented defense counsel from eliciting testimony from Officer Baroni regarding the nature and quality of the police department investigation. Defense counsel inquired of Officer Baroni whether Officer Carter's police report referred to an African-American male riding a bicycle. When Officer Baroni indicated he was not sure, defense counsel asked how Baroni would have known about the person unless that individual was mentioned in Officer Carter's report. The trial court sustained the prosecutor's objection on the ground the question called for testimony involving inadmissible hearsay.

It is apparent that the trial court ruled correctly in sustaining the objection. (Evid. Code, § 1200.) Moreover, the defense exercised the full opportunity it

was afforded to inquire into the nature of the police investigation during its examination of numerous witnesses. Thus, for example, defense counsel questioned (1) Officer Delgado concerning the police dispatch and the investigation he conducted at the time of defendant's arrest, (2) Officers Thomas and Carter concerning the investigation and collection of evidence at the murder scene, (3) Deputy Sheriff Hawkins concerning the firearms evidence, (4) Deputy Sheriff Edwards concerning his observations of the murder scene and Treto's automobile, (5) Deputy Sheriff Cross concerning the discovery of the automobile and the efforts made to preserve finger- prints, (6) Officer Eldridge concerning the description of the suspect ob- tained from interviews at the scene, and (7) Ms. Owen (the fingerprint technician) concerning the fingerprint samples.

■ Defendant next contends that the trial court erroneously prevented defense counsel from eliciting testimony from Officer Baroni concerning the police investigation into Juan Cebreros's background. Defense counsel in- quired of the witness whether the police had conducted any background investigation of the Cebreros brothers. The prosecutor objected and re- quested an offer of proof. Defense counsel, who possessed information that Favio kept several guns at his apartment and that the brothers had been arrested for possession of cocaine, explained that he wished to ascertain whether the police had inquired whether the Cebreros brothers owned any guns or had a "drug background." The trial court, having determined that defense counsel were attempting "third party" impeachment of the Cebreros brothers, precluded that line of inquiry.

The trial court did not abuse its discretion in forestalling that line of questioning. The record establishes that Juan Cebreros was arrested for possession of cocaine in the summer of 1985 and that the charges were dismissed in October 1985, several months prior to the murder. Therefore, the dismissal of the charge against Juan Cebreros was unrelated to his testimony at the present trial and irrelevant to a determination of the potential bias or credibility of that witness. (*People v. Dyer, supra,* 45 Cal.3d 26, 48.)

■ Defendant further contends that the trial court erred in preventing defense counsel from cross-examining Treto's wife concerning letters that had been found in his wallet, written by another woman to Treto, apparently concerning their relationship. Upon objection by the prosecution, defense counsel explained that the line of inquiry was necessary in order to develop the defense theory that Treto had been murdered by another party as a result of that relationship. The trial court declined to permit cross-examination on that subject, determining that defense counsel had not provided information

to support a plausible theory that the murder somehow was connected to Treto's personal life.

The trial court did not abuse its discretion by precluding that line of inquiry. The defense did not offer any evidence indicating a third party had committed the murder. (See *People v. Bradford, supra*, 15 Cal.4th 1229, 1325.) Moreover, although the defense was informed it could subsequently reintroduce the subject of the letters upon further development of a theory of the murder related to Treto's purported involvement with such a third party, counsel did not do so.

 Finally, defendant asserts that the trial court's failure to permit the defense to elicit testimony on these subjects was the result of an effort by the trial court to "rush the case to completion," violating defendant's constitutional right to due process of law. Defendant relies upon several other incidents that, he asserts, establish the trial court's improper conduct. Early in the proceedings, the trial court informed the parties that the trial, commencing on July 6, 1988, would be completed by Labor Day in September of that year. Later in the proceedings, upon early completion of the prosecution's presentation of testimony in the case-in-chief, defense counsel requested a one-day continuance in order to discuss with defendant the possibility of his testifying, but the trial court refused the request. Still later, during a discussion of the procedures for closing argument, defense counsel commented that he would, of course, not go on forever. The trial court responded that "I will beat the hell out of you, and it should be clear from the record that I have, in order to keep this trial going and not to waste time."

 A trial court must be careful not to permit its proper concern with the expeditious conduct of the trial to lead to an improper acceleration of the proceedings. (See *People v. Anderson* (1990) 52 Cal.3d 453, 469 [276 Cal.Rptr. 356, 801 P.2d 1107] [trial court may not give jury specific time limitations on its deliberations].) Nonetheless, we do not agree that the rulings or comments of the trial court described above demonstrate that the trial court improperly conducted the proceedings by precluding the development of evidence favorable to the defense.

In general, the " '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [31 Cal.Rptr.2d 321, 875 P.2d 36]; see *People v. Mincey, supra*, 2 Cal.4th 408, 442 [the right to a defense does not include the right to present to the jury a speculative, factually unfounded inference].) We have recognized, however,

that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684 [248 Cal.Rptr. 69, 755 P.2d 253].)

Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right. (*People v. Fudge, supra,* 7 Cal.4th 1075, 1103.) Accordingly such a ruling, if erroneous, is "an error of law merely," which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (*People v. Fudge, supra,* 7 Cal.4th at p. 1103.)

 In the present case, we have concluded that the trial court did not err with regard to any of these challenged rulings. Moreover, it does not appear that, had the trial court permitted the inquiries that defense counsel sought to make, the resulting testimony would have produced evidence of significant probative value to the defense. With regard to several of the topics that defense counsel sought to introduce or enlarge, counsel obtained equivalent testimony from witnesses through other, properly phrased questions. Although defense counsel was not permitted to develop such topics as Treto's earlier participation in pool tournaments and his apparent relationship with another woman, defendant's offers of proof simply did not indicate that relevant evidence of significant probative value would be forthcoming. (See *People v. Babbitt, supra,* 45 Cal.3d 660, 685.) It is not reasonably probable that defendant would have obtained a more favorable verdict had defense counsel been permitted to elicit testimony on these topics.

### 6. *Prosecutorial misconduct*

#### a. *Comment on defendant's change in appearance*

 Defendant contends that the prosecutor committed misconduct by suggesting to the jury that defendant deliberately had changed his appearance in order to raise doubts as to his identity as the perpetrator. According to defendant, that constituted misconduct because the prosecutor had knowledge, through her attendance at various preliminary proceedings, of the medical necessity for work performed on defendant's teeth, and of the circumstance that defendant's life in prison resulted in changes to his hair style and weight.

Prior to trial, in proceedings attended by the prosecutor, defendant repeatedly requested dental work, initially to remove several teeth including his gold front tooth, and subsequently to acquire replacement dentures.

During trial the prosecutor asked several witnesses in what respects defendant's present appearance was different from what it had been at the time of the murder. The witnesses testified that defendant's hair was shorter with more gray, that his facial hair was different, that the frames on defendant's glasses were darker, that he had lost 30 to 40 pounds, and that his front tooth no longer had a gold cap. Pursuant to the prosecutor's request, defendant displayed his front teeth to the jury.

Near the conclusion of the guilt phase, the defense requested that the trial court take judicial notice of the circumstance that defendant's dental work had been medically necessary rather than cosmetic in nature. The trial court explained that the court could verify only that defendant had requested dental treatment and not whether it had been medically necessary. Defense counsel requested that defendant's dental records be introduced into evidence. Pursuant to the parties' stipulation, defendant's dental records, revealing that three teeth had been removed due to decay, were admitted at trial.

During closing argument, defense counsel urged that defendant had not done anything to change his appearance. Defense counsel advised the jurors they would be able to review defendant's dental records and determine that his gold tooth had been replaced because his teeth were rotting. Defense counsel explained that defendant had been able to have his hair cut, and had lost weight because "jail food isn't wonderful."

 Under the federal Constitution, to be reversible, a prosecutor's improper comments must " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471, 91 L.Ed.2d 144]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [94 S.Ct. 1868, 1871-1872, 40 L.Ed.2d 431]; *People v. Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) " 'But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

" ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Jenkins, supra,* 22 Cal.4th 900, 1023.) If an objection has not been made,

" 'the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp, supra*, 20 Cal.4th 826, 858.)

In the present case, because any harm could have been cured by an admonition to the jury, defendant's failure timely to object and request the court to admonish the jury precludes his claim of misconduct. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 185 [14 Cal.Rptr.2d 342, 841 P.2d 862] [any misconduct in referring to the defendant's courtroom appearance as a "ploy" could have been cured by admonition]; *People v. Visciotti, supra*, 2 Cal.4th 1, 80 [any misconduct in questioning the defendant about his changed appearance could have been cured by admonition].)

Further, even had the claim not been waived, it would fail on the merits. When, as in the present case, the claim is based upon "comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *People v. Clair* (1992) 2 Cal.4th 629, 663 & fn. 8 [7 Cal.Rptr.2d 564, 828 P.2d 705].) The prosecutor apparently wished to explain that defendant's appearance had changed between the time of the murder and the time of trial, and therefore witnesses would describe him differently from his appearance at trial. As a general matter, such argument would not be improper. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 974 [2 Cal.Rptr.2d 112, 820 P.2d 214] [defendant's alteration of appearance between the time of incident and the time of trial is relevant to the issue of identity].)

The prosecutor also apparently wished to convey, and it is reasonably likely the jury apprehended, that defendant *deliberately* altered his appearance in order to raise a doubt that he was the distinctively attired and coifed person described by a number of the witnesses. As a general matter, that argument was not improper, because it related to the issues of identity and consciousness of guilt. The specific suggestion that defendant arranged for dental work to be done to accomplish that end would have been improper had the prosecutor known that defendant was motivated solely by medical necessity to obtain the dental treatment, but it does not appear that was the case. When we consider the challenged comments as a whole, we cannot conclude that the prosecutor used a "deceptive" or "reprehensible" method to persuade the jury. (*People v. Berryman, supra*, 6 Cal.4th 1048, 1072.)

In addition, any misconduct by the prosecutor was not prejudicial. To the extent the prosecutor's opening statement ascribed an inaccurate motive to

certain of the changes made by defendant in his physical appearance, the inaccuracy was harmless because the jury was instructed that the opening statement was not evidence and defendant had an opportunity to confront all witnesses and to challenge and rebut all evidence offered against him. (*People v. Wrest* (1992) 3 Cal.4th 1088, 1109-1110 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Defendant presented evidence of the medical need for his dental work, and in closing argument the defense offered reasons for the other physical changes. Moreover, the prosecutor's challenged argument related to the issue of identity, an issue upon which there was overwhelming independent evidence to support the verdict. (See *People v. Sandoval, supra*, 4 Cal.4th 155, 185 [any misconduct in the prosecutor's argument that the defendant's changed appearance was a "ploy" was harmless in light of the overwhelming evidence of guilt].)

### b. *Comment on defense counsel*

 Defendant contends that the prosecutor committed prejudicial misconduct by undermining the credibility of defendant's counsel. During her closing argument at the guilt phase, the prosecutor alluded to a compliment the trial court made to the prosecutor and the defense attorneys. The prosecutor stated it had been a pleasure to work with defense counsel, then added: "They are extremely fine. And what is their job? Their job is to create straw men. Their job is to put up smoke, red herrings. And they have done a heck of a good job. And my job is to straighten that out and show you where the truth lies. So let's do that."

As the People have observed, defense counsel failed to object. Moreover, the prosecutor's comments are not so extreme that an admonition would not have cured any harm. (See, e.g., *People v. Gionis* (1995) 9 Cal.4th 1196, 1216-1217 [40 Cal.Rptr.2d 456, 892 P.2d 1199] [prompt admonition corrected any jury misconceptions caused by statement, " ' "You're an attorney. It's your duty to lie, conceal and distort everything and slander everybody." ' "].) Therefore, the claim is waived.

Even if we consider the claim on the merits, however, we would conclude there is no reasonable likelihood that the jury improperly was influenced by the prosecutor's remarks. (*People v. Sanders* (1995) 11 Cal.4th 475, 526 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Cain, supra*, 10 Cal.4th 1, 48.) In *People v. Marquez, supra*, 1 Cal.4th 553, 575-576, we determined that the prosecutor's comments, that a " 'heavy, heavy smokescreen has been laid down [by the defense] to hide the truth from you,' " constituted a proper argument in response to the defense presented. In *People v. Cummings, supra*, 4 Cal.4th 1233, 1302, we concluded that a prosecutor's argument

accusing the defense of attempting to hide the truth, and his argument employing an "ink from an octopus" metaphor, would be understood as nothing more than urging the jury not to be misled by the evidence. (See also *People v. Medina, supra,* 11 Cal.4th 694, 759; *People v. Gionis, supra,* 9 Cal.4th 1196, 1216; *People v. Mitcham, supra,* 1 Cal.4th 1027, 1081-1082.)

The prosecutor's remarks in the present case similarly would be understood by the jury as an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel. Accordingly, we also reject defendant's contention that defense counsel rendered ineffective assistance in failing to object to the remarks or seek an admonition.

### 7. *Ineffective assistance of counsel*

Defendant claims that his counsel rendered ineffective assistance under both the Sixth Amendment of the federal Constitution and the California Constitution, article I, section 15. To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694 [104 S.Ct. 2052, 2064-2068, 80 L.Ed.2d 674]; see *Williams v. Taylor* (2000) 529 U.S. 362, 391-394 [120 S.Ct. 1495, 1511-1514, 146 L.Ed.2d 389]; *People v. Kraft* (2000) 23 Cal.4th 978, 1068 [99 Cal.Rptr.2d 1, 5 P.3d 68].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068]; *People v. Riel* (2000) 22 Cal.4th 1153, 1175 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record. "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft, supra,* 23 Cal.4th 978, 1068-1069; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

#### a. *Jury voir dire*

 Defendant contends that defense counsel rendered ineffective assistance by failing to conduct an adequate voir dire, thereby depriving defendant

of an impartial jury. Defendant asserts that defense counsel failed to ascertain whether prospective jurors harbored any bias against African-Americans or against interracial dating (defendant's girlfriend was Caucasian), had difficulty with interracial identification, or were prejudiced against a person previously convicted of a felony.

The record reflects that in open court, defense counsel inquired of several prospective jurors whether defendant's racial background was relevant, and presumably such questioning alerted other prospective jurors to consider that circumstance in responding to questions about their ability to be impartial. Defense counsel also asked the prospective jurors whether they themselves would be comfortable if judged by a juror who had their state of mind, whether they were comfortable sitting on this case, whether they could be fair to both sides, whether they believed that the presumption of innocence was appropriate, whether they had any prejudices or biases, and whether there was anything else the attorneys should know.

Although, in a capital case, questions concerning racial prejudice must be posed if requested by the defense, there is no federal constitutional requirement that such questions be asked. (*Turner v. Murray* (1986) 476 U.S. 28, 36-37, fn. 10 [106 S.Ct. 1683, 1688-1689, 90 L.Ed.2d 27].) The record does not reflect that defense counsel's failure to voir dire each individual juror with specific questions regarding racial issues, or the issue of defendant's status as an ex-felon, was not—or could not be—the result of a sound tactical decision. For example, defense counsel reasonably could have determined that the other, more general questions asked concerning possible bias were more likely to reveal the specific forms of bias than would result from direct questioning on those subjects. (*People v. Horton* (1995) 11 Cal.4th 1068, 1123 [47 Cal.Rptr.2d 516, 906 P.2d 478]; see *People v. Freeman* (1994) 8 Cal.4th 450, 485-486 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) Defendant has not established that trial counsel rendered ineffective assistance by questioning the prospective jurors in this manner.

### b. *Development of defense*

Defendant contends that defense counsel were ineffective in failing to develop an overall strategy and present an effective defense. Defendant observes that defense counsel merely relied upon cross-examining the chief prosecution witness, Juan Cebreros, in developing the primary defense theory of mistaken identity. Defense counsel assertedly should have (1) retained experts to testify concerning the unreliability of cross-racial identification, the effect of Cebreros's inebriation on his ability to perceive events accurately, and the effect of inadequate lighting at the scene on his ability to

perceive the identity of the killer; (2) more thoroughly examined Officer Ortiz, the Spanish-speaking officer who interviewed Cebreros at the scene and reported that Treto had raised his arm prior to the shooting; (3) investigated the backgrounds of Treto and Cebreros to discover evidence suggesting that the murder may have been the result of their illegal activities; and (4) investigated illegal activities at the Pair of Aces bar.

The disparate racial backgrounds of defendant and the victims, the quality of lighting at the scene, and Cebreros's alcoholic intake were established on direct examination of the prosecution's witnesses. Defendant has not shown any prejudice from counsel's failure to produce experts on each of these matters. (*People v. Lucas, supra,* 12 Cal.4th 415, 448, fn. 5.) Nor has defendant shown prejudice from defense counsel's failure to re-call Officer Ortiz, because it is not apparent what his further testimony would have been. (See *People v. Wash* (1993) 6 Cal.4th 215, 269 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) Counsel may have chosen not to reexamine that witness in order to avoid any further testimony concerning Cebreros's description of defendant and the circumstances of the offenses. The record reflects that defense counsel had knowledge of Cebreros's and Treto's background and activities at the bar and sought to question witnesses concerning those subjects. It is speculative to assume counsel did not investigate these matters.

Defendant further asserts that in developing the alternative defense theory that defendant was guilty of an offense other than first degree felony murder, defense counsel should have (1) established that defendant was medicated with Zantac, which, in combination with his alcohol consumption, impaired his capacity; (2) retained an expert to testify concerning the effects of that combination upon defendant's system; and (3) argued that the shooting resulted from an interracial altercation sufficient to establish legal provocation.

At least insofar as revealed by the record on appeal, we cannot find that defense counsel fell below the standards expected of a reasonably competent defense attorney in choosing to attempt to raise a doubt concerning identification in a case in which the prosecution relied upon a sole eyewitness who had been drinking and who viewed the perpetrator under less than optimal lighting conditions—rather than choosing to promote a theory that, even if defendant were the person who shot the victim in the course of a robbery, defendant was guilty of an offense other than first degree murder. (*People v. Thomas* (1992) 2 Cal.4th 489, 531 [7 Cal.Rptr.2d 199, 828 P.2d 101] [defense's failure to argue an alternative theory to reasonable doubt as to guilt is not objectively indicative of ineffective representation as a matter of

law]; *People v. Haskett* (1982) 30 Cal.3d 841, 852-853 [180 Cal.Rptr. 640, 640 P.2d 776] [counsel not ineffective in choosing an alibi defense instead of diminished capacity as a matter of tactics].)

 c. *Argument on intent to kill*

 Defendant contends that defense counsel rendered ineffective assistance by failing to present argument refuting the prosecutor's claim in closing argument that defendant intended to kill Treto. Defendant asserts that defense counsel should have argued that defendant had no actual intent to kill due to a combination of alcohol intoxication and the side effects of medication.[8]

At the time the present offenses were committed, this court had decided that a felony murder could not constitute a special circumstance that would render the defendant eligible for the death penalty unless, in committing the murder in the course of a felony, the defendant acted with the intent to kill. (*Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*), overruled by *People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1147 [240 Cal.Rptr. 585, 742 P.2d 1306] [requiring a finding of intent to kill, in order to establish a special circumstance, only when the defendant was an aider and abettor rather than the perpetrator of the murder].)

In the present case, during closing argument the prosecutor, after initially suggesting to the jury that the finding of intent to kill "doesn't have anything to do with whether you find the special circumstance or not," nonetheless went on to argue that intent to kill had been established. The prosecutor pointed to the evidence establishing the position of the wound in the center of the body, the circumstance that defendant made no attempt to summon help following the shooting, and the testimony of Cebreros that he started running because he believed defendant was going to kill him.

The defense argument had two primary elements. Counsel argued that Cebreros either was inaccurate or deliberately false in his identification of defendant as the killer, and emphasized the initial police reports of a second

---

[8]In connection with the claim defense counsel rendered ineffective assistance by failing to argue that defendant had no actual intent to kill, defendant points to his hearing testimony that at the time of his arrest he was taking the prescription medication "Zantax." He requests that we judicially notice a portion of the Physician's Desk Reference describing the possible side effects of the medication Zantac. As we explain below, defense counsel did not render ineffective assistance by arguing that defendant was not the killer and that the actual killer acted without intent to kill. Accordingly, we have no occasion to take judicial notice of this information.

suspect. In addition, however, defense counsel argued that, whoever the shooter was, he had no intent to kill and merely fired the weapon in response to Treto's resistance. Defense counsel also asserted that whoever killed Treto formed the intent to kill and accomplished the killing prior to forming the intent to take Treto's property, and thus that a felony murder based upon robbery had not occurred.[9]

As we observed above, counsel does not render ineffective assistance by choosing one or several theories of defense over another. (*People v. Thomas, supra,* 2 Cal.4th 489, 531-532.) By arguing as they did, defense counsel were able to focus upon the failure of the witnesses to identify defendant correctly as the killer, while at the same time seeking to undermine the assertion that there had been intent to kill regardless of the identity of the killer. The alternative approach that defendant here advocates, in effect, would have conceded defendant was the killer, in contravention of the chief defense theory. Defense counsel justifiably selected the former approach.

### 8. *Refusal to instruct on lesser offenses*

Defendant contends that the trial court erred in refusing to instruct the jury other than on a theory of first degree felony murder, in violation of state law as well as defendant's right to an impartial jury under the Sixth Amendment and to due process of law under the Fourteenth Amendment to the federal Constitution. The record reflects that defendant requested instructions on second degree malice murder, second degree felony murder, voluntary manslaughter, as well as instructions that referred to involuntary manslaughter and theft. The trial court declined to give these instructions to the jury and instead instructed only on first degree murder based upon a felony-murder theory.[10]

" '[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence . . . .' [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d

[9]In addition, defense counsel previously had moved for a judgment of acquittal pursuant to section 1118.1, concerning the allegation of the felony-murder special circumstance, on the ground that the evidence was insufficient to establish an intent to kill.

[10]At the conclusion of the guilt phase, the trial court instructed the jurors that if they returned a verdict of first degree murder (implicitly with one or more special circumstances), the penalty would be determined in a separate proceeding, whereas if they returned a verdict of murder in the second degree or any lesser offense, the penalty would be determined in the manner provided by law. Although defendant suggests the trial court thereby expressed ambivalence about its ruling, it appears that the court simply failed to modify the standard instruction (CALJIC No. 17.43) to eliminate reference to any homicide offense less than first degree murder, in advising the jury concerning the separate penalty proceeding upon a finding of first degree murder.

392].) "To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present." (*Ibid.*) Conversely, even on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction. (See *People v. Avena, supra,* 13 Cal.4th 394, 414.) " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis, supra,* 25 Cal.4th at p. 645.)

 The record in the present case does not contain any substantial evidence to support defendant's conviction of second degree malice murder rather than first degree felony murder. There is no substantial evidence to support the theory that defendant may have shot Treto with the intent to kill or with a conscious disregard of a high probability of danger to human life, but without taking or attempting to take Treto's money or his vehicle. (§ 189; *People v. Waidla, supra,* 22 Cal.4th 690, 739-740 & fn. 17; *People v. Wilson* (1992) 3 Cal.4th 926, 940-941 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People v. Neely* (1993) 6 Cal.4th 877, 897 [26 Cal.Rptr.2d 189, 864 P.2d 460]; see *People v. Morris* (1991) 53 Cal.3d 152, 211 [279 Cal.Rptr. 720, 807 P.2d 949].) The evidence of defendant's conduct prior to and at the time of the killing consistently reveals that he anticipated, intended, and committed, a robbery, and, if he did not anticipate, he certainly intended, to commit murder.

Similarly, there is no substantial evidence to support the theory that defendant formed the intent to steal the property only after committing the murder, thus justifying an instruction on theft. (*People v. Lewis* (1990) 50 Cal.3d 262, 276-277 [266 Cal.Rptr. 834, 786 P.2d 892].) Moreover, the trial court instructed the jury, pursuant to CALJIC No. 8.21, that an unlawful killing in which death occurred *as a result of* first degree robbery is first degree murder if the perpetrator had the specific intent to commit robbery. The jury would have known from this instruction that defendant's intent to steal had to have arisen prior to the murder. (See *People v. Lewis, supra,* 25 Cal.4th at pp. 647-648, fn. 6; see also *People v. Silva* (2001) 25 Cal.4th 345, 371-372 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

Nor does the record contain any substantial evidence to support defendant's conviction of second degree felony murder based upon the commission of a felony other than robbery or another felony enumerated in section 189, but nonetheless inherently dangerous to human life. (*People v. Rios* (2000) 23 Cal.4th 450, 460, fn. 6 [97 Cal.Rptr.2d 512, 2 P.3d 1066]; *People v.*

*Millwee* (1998) 18 Cal.4th 96, 156-157 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Patterson* (1989) 49 Cal.3d 615, 620-621 [262 Cal.Rptr. 195, 778 P.2d 549].) Defendant suggests that that instruction was supported by the evidence establishing that defendant, a convicted felon, possessed a firearm. In *People v. Satchell* (1971) 6 Cal.3d 28, 39-41 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383], overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869], we held that the latter offense does not constitute a felony inherently dangerous to human life.

Again ignoring the evidence that defendant committed robbery, defendant asserts there is substantial evidence to support an instruction on voluntary manslaughter on the theory that he acted in the heat of passion after the occurrence of a racial incident somehow engendered when Treto confronted the African-American man who was riding a bicycle prior to the shooting. Nothing in the evidence suggests any relationship between defendant's acts in demanding money and shooting the victims, and the earlier incident involving the other man. (See *People v. Pride, supra,* 3 Cal.4th 195, 250.) Defendant suggests that, in the alternative, there is substantial evidence to support the theory that he acted in unreasonable self-defense. The combined evidence of Treto's conduct and the distance between the two men at the time of the shooting negates rather than supports that theory.

Finally, there is no substantial evidence to justify instruction on involuntary manslaughter based upon the theory that defendant's intoxication prevented his forming the specific intent to kill. Effective January 1, 1982, the Legislature abolished "diminished capacity" as a defense, while continuing to permit evidence of voluntary intoxication or mental disorder on the issue whether the defendant "actually formed" the requisite mental state. (§§ 22, 28.) The evidence of intoxication was too insubstantial to support any such instruction. The trial court's refusal to so instruct the jury did not constitute error. (*People v. Neely, supra,* 6 Cal.4th 877, 897.)

### 9. *Cumulative error*

Defendant contends that a combination of errors rendered his trial fundamentally unfair, requiring reversal. ■■■ "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill, supra,* 17 Cal.4th 800, 844.) The few errors that occurred during defendant's trial were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one. (*People v. Box* (2000) 23 Cal.4th 1153, 1214 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

## C. Special circumstances issues

### 1. Intent to kill—present murder

#### a. Substantial evidence

Defendant contends the jury's finding on the felony-murder special circumstance must be set aside because there was insufficient evidence of intent to kill. As we discussed earlier, such evidence of intent to kill was required because the case arose following *Carlos, supra,* 35 Cal.3d 131, 153-154, and prior to *People v. Anderson, supra,* 43 Cal.3d 1104, 1138-1147. According to defendant, the evidence establishes that Treto was drunk and bellicose, had a racial altercation with an African-American man on a bicycle, and attempted to provoke a fight with defendant shortly before the shooting. Defendant had consumed at least five drinks and was taking medication. Just prior to being shot, Treto lifted his hand, perhaps in a gesture of resistance.

" ' "In reviewing the sufficiency of evidence for a special circumstance"—as for a conviction—"the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." ' [Citations.]" (*People v. Cain, supra,* 10 Cal.4th 1, 39.) The finding therefore must be supported by substantial evidence, " ' "that is, evidence which is reasonable, credible, and of solid value . . . ." ' " (*People v. Bradford, supra,* 15 Cal.4th 1229, 1329.)

A review of the record discloses substantial evidence from which a rational jury could find beyond a reasonable doubt that defendant possessed the intent to kill. The evidence was inconclusive as to how much defendant had to drink prior to the murder, but there was no testimony that he behaved as if intoxicated. Just prior to approaching the victims outside, defendant spent some time in the restroom of Ricky's Lounge, as if preparing himself for the robbery. Although Treto had had words with the African-American man on the bicycle, Treto had spoken about being friends and embraced him prior to the time defendant approached Treto as Treto prepared to depart in his automobile. When defendant commanded that Treto hand over the money, Treto raised his hand or hands but was not observed reaching for defendant's gun, and the absence of powder burns on his clothing established that the two men were a number of feet apart from each other at the time of the shooting. Having dispatched Treto with a shot to the chest, defendant then shot at Cebreros, who was running away and posed no threat. There clearly was sufficient evidence that defendant acted with the intent to kill Treto.

### b. *Special verdict in lieu of instruction*

Defendant contends that the trial court erred in failing to instruct the jurors that in order to find true the special circumstance allegation of murder committed while defendant was engaged in the commission of a robbery, they had to find that defendant possessed the intent to kill. At the guilt phase, the trial court declined defense counsel's request to give an instruction defining express malice, instead requiring the jury to make a special finding whether defendant possessed the intent to kill, at the same time the jury rendered a verdict on the murder itself. In addition, as discussed above, both the prosecution and the defense in closing argument addressed the issue of defendant's intent to kill.[11]

In finding defendant guilty of first degree murder committed in the course of a robbery, the jury made the special finding that defendant possessed the intent to kill. As we have seen, this finding is supported by substantial evidence. Under these circumstances it is clear that the erroneous omission of the instruction requested by defendant, or of an instruction informing the jury it had to find defendant intended to kill in order to find the robbery-murder special circumstance true, was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. 18, 24 [87 S.Ct. 824, 828]; *People v. Flood, supra*, 18 Cal.4th 470, 504; cf. *People v. Harris* (1989) 47 Cal.3d 1047, 1099-1100 [255 Cal.Rptr. 352, 767 P.2d 619].)

### 2. *Ineffective assistance of counsel—admission of prior murder conviction*

Defendant contends the special circumstance finding that defendant previously had been convicted of second degree murder must be reversed due to the ineffective assistance of defense counsel in failing to review the earlier case for the purpose of collaterally attacking the conviction and

---

[11]Defendant urges that no instruction required the jury to find intent to kill, or the special circumstance of felony murder, beyond a reasonable doubt. As we have explained, the trial court required the jury to make its special finding on intent to kill and to consider whether the felony-murder special circumstance was true at the time the jury decided whether defendant was guilty of murder. The trial court gave CALJIC No. 2.90 (1979 rev.) on the prosecutor's burden of proof beyond a reasonable doubt. The court also gave defendant's special instructions informing the jury (1) that defendant was charged with crimes requiring that a specific intent to commit the crime or a mental state be established beyond a reasonable doubt before the crime or degree of the crime was proven and to consider whether defendant's mental condition prevented his forming that specific intent; and (2) that the prosecutor has the burden of establishing every element of the charge against the defendant beyond a reasonable doubt, including defendant's presence. The trial court gave these instructions together with the other instructions prior to the jury's consideration of all the allegations pertaining to the present offenses. Nothing suggests that the jury would not have applied the beyond a reasonable doubt standard of proof in making those findings.

moving to strike the special circumstance. Defendant asserts that defense counsel's failure was prejudicial for two reasons. First, the evidence of the prior murder conviction should not have been submitted to the jury as a special circumstance. Second, during the penalty phase, a police officer who investigated the prior murder testified on behalf of the prosecution concerning the officer's custodial interview with defendant, as well as the officer's discovery, in a search of defendant's apartment, of a magazine depicting a graphic wound to a woman's breast similar to that inflicted on the victim in the prior murder. According to defendant, that testimony was admitted without objection by defense counsel at the penalty phase of the present trial, despite the circumstance that the evidence had been ruled inadmissible at the prior trial.[12]

The record reflects that in October 1987, eight months prior to trial, defense counsel subpoenaed certain records from defendant's prior murder conviction proceedings, but as of August 1, 1988, the records still had not been received. At that time, defense counsel noted that both the prosecution and the defense had been unable to obtain the transcript either of the preliminary hearing or the trial in the prior murder case. The court and the clerk advised counsel that a search would be commenced. The following day, the clerk of the court announced that a search had not uncovered the file in the courthouse and that she would contact the archives department.

On August 9, 1988, defense counsel, explaining that they needed the records to determine the validity of the "prior waivers," informed the court

---

[12]In support of this contention, defendant requests that we judicially notice the reporter's transcript of defendant's 1976 trial for the murder of Ella Mae Fellows, as well as a search warrant and supporting documents prepared by the police, authorizing the search of defendant's residence in the course of their investigation. We may, but need not, take judicial notice of the records of a court of this state pursuant to Evidence Code section 452, subdivision (d). Defendant contends that we are required to take judicial notice pursuant to Evidence Code section 453, but that section imposes compulsory judicial notice upon request in the trial court, and this material was not before the trial court. Evidence Code section 459, subdivision (a), imposing limited compulsory judicial notice upon a reviewing court, is inapplicable because the trial court was not required to take judicial notice of material never presented. (See *People v. Waidla, supra,* 22 Cal.4th 690, 703, fn.1; *In re Carpenter* (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985]; *People v. Hardy* (1992) 2 Cal.4th 86, 134 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

We elect not to take to take judicial notice of these documents. (Evid. Code § 459, subd. (a).) Respondent has opposed defendant's request on the ground that the material is submitted in connection with a claim of ineffective assistance of counsel that requires consideration of facts outside the record regarding defense counsel's tactical reasons for the manner in which the defense was conducted. (Cf. *People v. Hardy, supra,* 2 Cal.4th 86, 134-135.) In addition, the claim has been raised in defendant's petition for writ of habeas corpus. Consideration of the matter in that context is more appropriate in resolving claims of ineffective assistance of counsel. (*People v. Waidla, supra,* 22 Cal.4th 690, 703, fn. 1; *People v. Diaz* (1992) 3 Cal.4th 495, 557-558 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

that they had not obtained transcripts of the prior murder trial from the clerk and that the district attorney did not have a copy. The clerk advised that she had not yet heard from the archives department. On August 10, the clerk announced that the file had been located in the archives and would be sent "rush." On August 17, 1988, defense counsel indicated that the previous week he had reviewed the superior court file, but that the "jury waiver" and trial transcripts remained unavailable. Defense counsel explained that they had contacted the Court of Appeal but that court could not locate a transcript, and that they could not ascertain the identity of appellate counsel in the prior proceeding, had not yet contacted trial counsel, and were not prepared to begin the special circumstances phase. The trial court indicated the proceedings would go forward. On August 22, 1988, trial on the special circumstances commenced.

We have recognized a defendant's right in a capital case to collaterally attack the constitutional validity of a prior conviction used to enhance a defendant's punishment for the current offenses. (*People v. Horton, supra,* 11 Cal.4th 1068, 1129-1134; see *Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1296 [276 Cal.Rptr. 49, 801 P.2d 292].) In the interests of efficiency, defendants are advised to proceed by means of a pretrial motion to strike the prior conviction. (*People v. Horton, supra,* 11 Cal.4th at pp. 1130-1131.) "[W]hen a defendant challenges the validity of a prior conviction, he or she bears the burden of establishing its constitutional invalidity. To meet this burden, it is not enough for a defendant simply to make some showing that a constitutional error occurred in the prior criminal proceedings. A prior conviction carries a ' "*strong presumption of constitutional regularity*," ' and the defendant must establish a violation of his or her rights that ' "so departed from constitutional requirements" ' as to justify striking the prior conviction. [Citation.]" (*Id.* at p. 1136.)

On the basis of the present record, we cannot conclude as a matter of law that trial counsel in the present case unreasonably failed to obtain the required oral transcripts of the prior conviction, or necessarily should have moved to strike the prior conviction. Factual matters underlying such issues, including counsel's explanation for their actions, properly may be explored through a petition for writ of habeas corpus. (*People v. Diaz, supra,* 3 Cal.4th 495, 557-558.)

3. *Trial court's admission of prior conviction of assault on a police officer*

Defendant contends that the trial court erred in submitting to the jury, during the special circumstances phase, the issue whether defendant

previously had been convicted of assault with a deadly weapon on a police officer. That offense was neither charged as a special circumstance nor statutorily included as such, but rather was charged as a separate enhancement.

At the commencement of this phase of the trial, the trial court informed the jurors that they were to determine whether the prior convictions alleged were true, and whether the second prior conviction, for murder, was a special circumstance. Following presentation of the evidence of the prior convictions, the trial court instructed the jurors that there were three verdict forms on which to record their determination (1) whether defendant previously had been convicted of second degree murder, (2) whether defendant previously had been convicted of assault with deadly force on a police officer, and (3) whether the special circumstance allegation of a previous conviction for second degree murder was true.

The instructions on the prior-murder special circumstance were accurate and did not express or imply that the jury also might base a true finding of the special circumstance upon the other prior conviction for assault with deadly force on a police officer. We presume the jury acted reasonably and followed the instructions it was given. (*People v. Harris* (1994) 9 Cal.4th 407, 425-426 [37 Cal.Rptr.2d 200, 886 P.2d 1193]; see *Richardson v. Marsh* (1987) 481 U.S. 200, 211 [107 S.Ct. 1702, 1709, 95 L.Ed.2d 176].) Moreover, any conceivable error in not conducting a separate phase to determine the truth of the prior conviction allegation that was not also the subject of the special circumstance allegation was harmless. At the previous phase of the trial, the jury found defendant guilty of first degree murder and found true the special circumstance of murder during the commission of a robbery. There was no reasonable likelihood that the jury's consideration of evidence of the prior conviction for assault with deadly force on a police officer provided the basis for its true finding of the prior-murder special circumstance at this phase of the trial.

4. *Ineffective assistance of counsel—admission of prior assault conviction*

 Defendant contends that defense counsel rendered ineffective assistance both in stipulating at the guilt phase to the prior conviction of assault with a deadly weapon on a police officer and in failing to object when the prosecutor argued at the special circumstances phase that defendant had stipulated to that conviction. In fact, during the guilt phase defense counsel merely stipulated to defendant's having committed an unspecified felony on a certain date. During closing argument at the special circumstances phase,

defense counsel referred to defendant's previous stipulation to a felony that, as the prosecutor had noted, occurred on the same date as the documentary evidence of the assault conviction, while suggesting that, by contrast, the evidence failed to establish that defendant was the same person who committed the prior murder.

On the present record, we cannot find that defense counsel's admission of the assault conviction that clearly was established, while questioning the proof of the more serious prior murder conviction, did not fall within the permissible range of trial tactics of a reasonably competent attorney. (*People v. Jones* (1991) 53 Cal.3d 1115, 1150 [282 Cal.Rptr. 465, 811 P.2d 757]; see *People v. Mayfield* (1993) 5 Cal.4th 142, 176-177 [19 Cal.Rptr.2d 836, 852 P.2d 331].) Accordingly, the claim of ineffective assistance of counsel lacks merit.

D. *Penalty phase issues*

1. *Attempted sodomy in jail used as aggravating circumstance*

a. *Notice of intention to present evidence of sodomy*

Defendant contends that the prosecutor failed to give defense counsel adequate notice that she planned to present evidence of an unadjudicated attempted sodomy at the penalty phase.

On October 20, 1986, while in jail on the current charges, defendant attempted to sodomize another inmate. On October 27, 1986, defense counsel filed a written motion for discovery, including the names and addresses of all witnesses who would testify and all information pertaining to alleged criminal activity not charged in the present case. On November 3, 1986, defense counsel agreed to informal discovery, but the trial court directed the prosecutor to file a written notice of evidence to be used in aggravation at the penalty phase. On November 7, 1986, following a preliminary hearing, defendant was held to answer on the charge of attempted sodomy. On May 14, 1987, the prosecutor filed a written notice of intention to introduce evidence in aggravation under section 190.3, including the following: "Evidence will be introduced regarding [defendant's] current incarceration . . . including any incident reports and disciplinary matters, involving force or violence."

On July 6, 1988, jury selection commenced. On July 26, 1988, after the jury had been sworn, defense counsel objected to the presentation of evidence of the attempted sodomy, because the prosecution had not made the

information available prior to trial. The prosecutor responded that she had shown counsel a copy of the police report that counsel had read, and had supplied them with the case number prior to trial. She agreed to make a copy of the police report. The following day, defense counsel acknowledged receipt of the police report and information.

On August 22 and 24, 1988, following the guilty verdicts, defense counsel moved to exclude evidence of the attempted sodomy unless the prosecutor produced the victim, and not simply a witness, Henry White, who had testified at the preliminary hearing. Defense counsel argued the notice was insufficient, but conceded that they had received oral notice in May 1988. The trial court found the notice adequate and granted the defense request to interview the witness the following morning.

Defendant did not object at trial on the basis of prosecutorial misconduct, and the claim is therefore waived. (*People v. Champion* (1995) 9 Cal.4th 879, 942 [39 Cal.Rptr.2d 547, 891 P.2d 93].) In any event, the claim must be rejected on the merits. Section 190.3 provides that other than evidence in proof of the charged offense or special circumstances subjecting the defendant to the death penalty, the prosecution may not present evidence in aggravation "unless notice . . . has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." The statute does not mandate written notification. (*People v. Turner* (1990) 50 Cal.3d 668, 708, fn. 24 [268 Cal.Rptr. 706, 789 P.2d 887].)

In the present case, defense counsel received general written notification as well as more specific oral notification prior to trial. Counsel received additional specific written information, including the police report, prior to the guilty verdicts. (See *People v. Bradford, supra,* 15 Cal.4th 1229, 1359-1360.) The notice was adequate. (Cf. *People v. Taylor* (1990) 52 Cal.3d 719, 736-737 [276 Cal.Rptr. 391, 801 P.2d 1142] [notice adequate when actual notice is given prior to trial but written notice is not filed until after the guilty verdicts were rendered]; *People v. Walker* (1988) 47 Cal.3d 605, 637 [253 Cal.Rptr. 863, 765 P.2d 70] [same].)

Moreover, defendant has not shown how he would have dealt with the witness differently had he received earlier notice that the witness would be called. (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1153-1154.) Defense counsel asked for a half-day to interview the witness, which was granted, and did not request additional time. (*Ibid.*) There is no reasonable possibility that defendant suffered prejudice from the manner in which the prosecution provided notice of the attempted sodomy. (*People v. Bradford, supra,* 15 Cal.4th 1229, 1360.)

b. *Admission of evidence of attempted sodomy*

 Defendant contends that the trial court abused its discretion in admitting the evidence of attempted sodomy because that evidence was substantially more prejudicial than probative. He also claims that the evidence did not establish the offense beyond a reasonable doubt and did not establish that an act of violence had occurred.

 Section 190.3, factor (b), permits the trier of fact to take into consideration at the penalty phase "evidence of violent criminality committed at any time in the defendant's life, and whether or not adjudicated, to show his propensity for violence and to assist the sentencer in determining whether he is the type of person who deserves to die. [Citations.] The prosecution may prove commission of such conduct by any competent means, and may also place the incident 'in context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness.' [Citations.] The trial court has no discretion to exclude such *incidents* under Evidence Code section 352 on the ground they are substantially more prejudicial than probative at the penalty phase. [Citation.] Nor is the defendant entitled to preclude admission of the graphic or sordid details of his factor (b) crimes by stipulating to any resulting conviction or to a sanitized version of the facts surrounding the offense. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349-350 [52 Cal.Rptr.2d 296, 914 P.2d 846], italics added; cf. *People v. Box*, *supra*, 23 Cal.4th 1153, 1200-1201 [at penalty phase, trial court retains discretion to exclude *particular items* of evidence if substantially more prejudicial than probative].) Testimony by an eyewitness is a competent means to prove the offense. (*People v. Coleman* (1988) 46 Cal.3d 749, 782-783 [251 Cal.Rptr. 83, 759 P.2d 1260].)

 There was substantial evidence that would permit a rational jury to find beyond a reasonable doubt that defendant committed the prior offense, and that the act was violent or forcible in nature. The witness testified that he observed defendant hit the victim in the head, push him to his knees, place him in a headlock, and put his erect penis into the victim's rectum. The witness testified that it appeared the victim was forced and did not consent to being sodomized. Although, as defendant has pointed out, there was no testimony that the victim cried out, in view of the other evidence that defendant's conduct was forcible that circumstance does not establish that the encounter was consensual.

c. *Instructional error on attempted sodomy*

 Defendant contends that the jury instruction on attempted sodomy was erroneous as a matter of state and federal law, because the instruction

did not inform the jury it must find as elements that the act had been attempted without the other party's consent and with force, and to have been proved beyond a reasonable doubt.[13] The trial court instructed the jurors pursuant to former CALJIC No. 8.84.1.2, informing them that they could consider as an aggravating circumstance evidence of attempted sodomy involving the express use of force or violence, if proved beyond a reasonable doubt. Defendant did not request instruction on the elements of sodomy.

We repeatedly have held that a trial court does not have an obligation sua sponte to instruct at the penalty phase of a capital trial on the elements of offenses not currently charged. (*People v. Hawkins, supra,* 10 Cal.4th 920, 963-964.) As we also have explained, a defendant may have tactical reasons for declining to request such instructions in order not to emphasize unduly these crimes to the jury. (*Hawkins,* at pp. 963-964; *People v. Johnson* (1993) 6 Cal.4th 1, 48-49 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People v. Tuilaepa, supra,* 4 Cal.4th 569, 591-592.) Accordingly, the trial court did not err.

### 2. *Admission of defendant's statements to the police*

 Defendant contends that the judgment imposing the death penalty must be reversed because the prosecution's evidence and argument included references to defendant's extrajudicial statements to Officer Baroni. During cross-examination of defendant, the prosecutor inquired why defendant had told the officer he worked for Volt Temporary Services for nine years when actually he had worked for that company less than two weeks. Defendant responded that the officer had misunderstood him. During closing argument the prosecutor referred to defendant's statements to the police to illustrate that defendant lied to the police and failed to take responsibility for his actions. The jury was instructed to take account of all the evidence, which would include defendant's statements to the police presented at the guilt phase.

As discussed above (*ante,* at pp. 990-994), we have determined that defendant's statements to the officers properly were admitted at the guilt phase. Accordingly, the prosecution also was entitled to refer to them at the penalty phase. In any event, there is no reasonable possibility that the

---

[13]In connection with this claim, defendant requests that we take judicial notice of a judgment conditionally granting an unrelated petition for writ of habeas corpus filed in the United States District Court for the Central District of California reflecting a reversal of certain of that defendant's convictions because, during the trial on the issue of guilt, the court failed to instruct on any elements of those offenses. As discussed below, instruction on the elements of an uncharged crime at the penalty phase is not required, and therefore, the judgment in the other case is irrelevant to the claim before us. Accordingly, we decline that request.

statements contributed to the penalty phase verdict. Defendant's statements merely were noted in order to emphasize his tendency to prevaricate. In view of the quantity of other evidence presented at the penalty phase demonstrating defendant's tendency to lie, as well as to commit more serious misconduct, there is no reasonable possibility that had the jury not considered that evidence, it would have rendered a different penalty verdict.

### 3. *Prosecutorial misconduct*

Defendant contends that the prosecutor committed misconduct at the penalty phase by (a) introducing inadmissible, irrelevant, and prejudicial evidence; (b) urging the jury to consider improper substantive matters in aggravation; and (c) misstating the record and referring to matters outside the record.

■ At the penalty phase, as at the guilt phase, on appeal a defendant may not complain of prosecutorial misconduct if the defendant does not timely object and request an admonition, unless an admonition would not have cured the harm. (*People v. Frye, supra,* 18 Cal.4th 894, 1017-1018; *People v. Jones* (1997) 15 Cal.4th 119, 181 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1209 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Garceau, supra,* 6 Cal.4th 140, 205-206.)

When misconduct has occurred, the defendant must demonstrate that it was prejudicial. (*People v. Williams* (1997) 16 Cal.4th 153, 255 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Sanchez* (1995) 12 Cal.4th 1, 66 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) To be prejudicial, prosecutorial misconduct must bear a reasonable possibility of influencing the penalty verdict. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1240 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Cain, supra,* 10 Cal.4th 1, 79.) In evaluating a claim of prejudicial misconduct based upon a prosecutor's comments to the jury, we decide whether there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner. (*People v. Sanchez, supra,* 12 Cal.4th at p. 69; see *People v. Rowland* (1992) 4 Cal.4th 238, 279-281 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

### a. *Introduction of evidence*

■ Defendant contends the prosecutor knowingly introduced evidence that had been deemed inadmissible at defendant's prior trial for the 1975 murder of Ella Mae Fellows. At the penalty phase, Deputy Sheriff Kushner testified that in his interview with defendant following his arrest for that murder, defendant denied committing the murder, had no recollection of his

activities during the pertinent time period, and denied that Fellows was his girlfriend. Deputy Sheriff Kushner testified that during the police search of defendant's apartment, Kushner found a magazine containing scenes from a horror movie in which the victim had suffered knife wounds in a pattern very similar to those suffered by Fellows. Deputy Sheriff Kushner testified the police also found a knife of a size consistent with the dimensions of the victim's wounds.[14] A photograph of that knife also was admitted.

Defendant challenges the introduction of the evidence of defendant's prior statements, the magazine, and the knife. Assuming, without deciding, that the evidence in question had been deemed inadmissible for purposes of the prior proceedings, the prosecutor did not commit prejudicial misconduct in introducing it in the current proceedings. We have held that a prosecutor may not *knowingly* elicit testimony that is inadmissible in the present proceedings. (See *People v. Pinholster, supra*, 1 Cal.4th 865, 964.) The record does not demonstrate that the prosecutor knowingly introduced evidence held inadmissible at the prior proceedings, and therefore misconduct has not been established. Even if we were to assume prosecutorial misconduct in seeking to introduce such evidence, a timely objection and ruling excluding this evidence would have cured any harm. (*People v. Jones, supra*, 15 Cal.4th 119, 181.)

Moreover, the prosecutor was entitled to introduce facts underlying the prior murder conviction. (*People v. Stanley* (1995) 10 Cal.4th 764, 818-819 [42 Cal.Rptr.2d 543, 897 P.2d 481] (*Stanley*); *People v. Cain, supra*, 10 Cal.4th 1, 70-71.) In *Stanley*, because the prior verdict of second degree murder impliedly acquitted the defendant of first degree murder (*Green v. United States* (1957) 355 U.S. 184, 190-191 [78 S.Ct. 221, 225-226, 2 L.Ed.2d 199, 61 A.L.R.2d 1119]), we recognized that evidence or argument intended to persuade the jury that the defendant had premeditated and deliberated in the commission of that murder would violate section 190.3, which expressly precludes the introduction of evidence of an offense of which a defendant has been acquitted. (*Stanley, supra*, 10 Cal.4th at p. 819; see *People v. Cain, supra*, 10 Cal.4th at pp. 70-71.) In *Stanley*, we held that the prosecutor did not present evidence or argument that the defendant actually was guilty of a first degree murder. (*Stanley*, at pp. 819-820.) We

---

[14]In support of this claim, defendant refers to the reporter's transcript of the prior murder trial and the search warrant and supporting affidavits that he has sought to have judicially noticed in connection with his claim of ineffective assistance of counsel. (See *ante*, at p. 1012, fn. 12.) The record on appeal does not establish that the prosecutor was familiar with the contents of these materials at the penalty phase of this trial, and therefore it is not appropriate to take judicial notice of them in order to evaluate the present claim of prosecutorial misconduct. (*People v. Waidla, supra*, 22 Cal.4th 690, 703, fn. 1; *People v. Hardy, supra*, 2 Cal.4th 86, 134.)

also concluded that the presentation of the evidence did not violate the defendant's constitutional protections against double jeopardy. (U.S. Const., 5th & 6th Amends.; Cal. Const., art. I, § 15.) (*Stanley, supra,* 10 Cal.4th at p. 820; *People v. Cain, supra,* 10 Cal.4th at pp. 70-72; see *People v. Visciotti, supra,* 2 Cal.4th at p. 71.)

Defendant urges that the testimony that a magazine was found in defendant's apartment, depicting wounds similar to those suffered by Fellows, was introduced and employed by the prosecutor to establish that defendant premeditated or deliberated and thus actually was guilty of the first degree murder of Fellows. Defendant notes the prosecutor referred to that evidence in argument, stating that defendant had killed Fellows "in the same way he'd seen in a magazine." The evidence did not establish that defendant planned the murder in advance or deliberated before committing it, but only that he may have copied another source while in the act of committing the murder of Fellows. The prosecutor's argument did not suggest anything more. (*Stanley, supra,* 10 Cal.4th at pp. 819-820.)

Defendant contends the prosecutor committed misconduct in introducing the testimony of a medical examiner who reviewed the forensic report prepared for the Fellows murder, and who described the deteriorated condition of the body of the victim when found. Defendant did not timely object to the admission of this evidence. (See *People v. Jones, supra,* 15 Cal.4th 119, 181.) In any event, because defendant had challenged the medical examiner's credibility on the basis of the examiner's failure to perform certain drug tests on the deceased, the prosecution was entitled to introduce the examiner's testimony describing the discovery of the body after a number of days, as established by the amount of decay, in order to demonstrate that it was too late to perform such tests, and thus refute the challenge to his credibility.

Defendant contends that the prosecutor improperly introduced a family photograph album of defendant into evidence and commented that defendant's label on one photograph of himself, "We are protecting one sick son-of-a-bitch," was an accurate self-description. A timely objection and admonition would have cured any harm caused by the prosecutor's action in seeking to introduce this evidence and commenting in that fashion. (*People v. Jones, supra,* 15 Cal.4th 119, 181.) In view of the admission of the album, the prosecutor's argument was within the permissible range of comment. (*People v. Thomas, supra,* 2 Cal.4th 489, 537.)

b. *Improper subjects of examination or argument*

Defendant contends that the prosecutor committed misconduct by urging the jury to consider nonstatutory matters in aggravation. We have

held that in deciding penalty, a jury may consider only the factors in aggravation set forth in section 190.3. (*People v. Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782].)

Defendant asserts that the prosecutor elicited testimony from the witness to the attempted sodomy that he did not wish to be housed near defendant or his associates because he feared retaliation, and that the prosecutor in closing argument referred to the witness's fear of retaliation, despite the absence of express or implied threats by defendant. Pursuant to section 190.3, factor (b), only a defendant's actual threat to use force or violence, whether express or implied, may be considered. It is apparent from the record, however, that the substance of the testimony and related argument clearly was intended to demonstrate that the witness was credible and would not be motivated to lie. (Evid. Code, § 785; cf. *People v. Clark, supra*, 5 Cal.4th 950, 1017.) It is not reasonably likely that the jurors understood the comments to suggest that defendant actually had threatened this witness.

Defendant contends that the prosecutor's closing argument that defendant on the street was a "vicious, heartless, cold-blooded killer," and would behave the same in prison, constituted impermissible comment on future dangerousness. First, viewed in context, the prosecutor made these comments following defense counsel's argument that defendant posed no substantial behavioral problems in prison. Second, prosecution argument citing a defendant's future dangerousness is proper when that is a permissible inference to be drawn from the evidence. (See *People v. Danielson* (1992) 3 Cal.4th 691, 720-721 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

Defendant asserts that in opening argument the prosecutor improperly informed the jury that its task was to decide whether defendant was "good or bad." In fact, the prosecutor described the weighing process of the penalty phase, telling the jury it was being called upon to "weigh aggravation versus mitigation. Good versus bad." Defense counsel objected to the reduction of the concept of weighing to "good versus bad," and the trial court explained to the jury that although counsel was permitted latitude in describing concepts, the jury was to follow the instructions regarding aggravation and mitigation.

Considered in context, the prosecutor merely provided a simplified explanation of the law that the jury was required to follow at this phase of the trial. (*People v. Johnson, supra*, 3 Cal.4th 1183, 1248.) The trial court clarified that more detailed instructions would explain the jury's actual task in this regard. In context, the prosecutor's comments cannot be construed as argument that the jury was to decide whether *defendant* was good or bad.

Defendant contends that the prosecutor improperly commented on defendant's negotiated plea in the 1980 case of assault with a deadly weapon on a police officer, informing the jury that defendant was treated with leniency because he pleaded guilty to that charge without having to plead guilty to the theft of the taxicab or the assault on the second police officer. Defense counsel objected on the ground it was improper to discuss the plea agreement or its effect. The trial court ruled that the prosecutor's argument was not improper, because defendant previously had raised the subject of leniency.

Defendant claims the prosecutor's argument attempted to treat as aggravating factors the offenses to which defendant had not pleaded guilty and the circumstance that defendant received a negotiated plea, and denigrated the plea negotiation system itself. Prior to the prosecutor's comments, defendant told the jury that he never had received a break in his life or received any leniency, and had been incarcerated following each arrest. In response, the prosecutor merely pointed out that, as revealed in defendant's criminal records, in fact defendant had been treated leniently and had not been incarcerated for every crime he had committed.

The prosecutor's argument was proper. On rebuttal, a prosecutor may refer to prior criminal conduct not admitted as evidence in aggravation under section 190.3 if it relates directly to a particular incident or character trait that defendant offered on his own behalf. (*People v. Noguera* (1992) 4 Cal.4th 599, 644-645 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Moreover, it is not reasonably likely that the jury understood the prosecutor's comments as advocating that it consider the negotiated plea itself as a factor in aggravation. (*People v. Sanders, supra*, 11 Cal.4th 475, 526.)

Defendant contends the prosecutor improperly argued that although defendant's mother cried while on the stand, defendant was unmoved by his mother's emotion, suggesting that by his demeanor he had shown himself to be a hardened criminal who deserved to die. It is proper for a prosecutor, at the penalty phase at which the defendant has placed his or her character in issue as a mitigating factor, to make references to the defendant's facial demeanor apparent during the court proceedings. (*People v. Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629].)

Defendant contends the prosecutor committed misconduct by utilizing testimony intended to be considered in mitigation as a circumstance in aggravation. The prosecutor, referring to defendant's testimony that he had taught children's Sunday school, commented that the thought of defendant teaching children "scared the daylights" out of her. She wondered what

lessons children would learn from defendant, in view of his description of himself as a pimp, murderer, adulterer, thief, and gambler. The prosecutor assertedly also committed misconduct by referring to evidence that defendant kept a photograph of the woman he had murdered in 1975 in the same box with a likeness of Jesus Christ, commenting that it made her "blood boil," and asking rhetorically how one could be a religious person and do that.

The prosecutor's comments did not suggest to the jury that these facts were to be considered in aggravation. Rather, the remarks were an appropriate response to defendant's previous testimony as to his good character and, in particular, as to his religious devotion. A defendant who offers evidence of his or her good character widens the scope of the evidence of bad character that may be introduced in rebuttal. (*People v. Noguera, supra,* 4 Cal.4th 599, 644.) "The scope of rebuttal legitimately embraces argument by the prosecutor 'suggesting a more balanced picture of [the accused's] personality.' [Citation.]" (*Ibid.*) The argument was proper.

Defendant contends that the prosecutor committed misconduct by attempting to establish defendant's homosexuality in order to prejudice the jury. As part of the evidence presented by the defense at the penalty phase, defendant explained that he had had *consensual* sexual encounters with men in prison, assuming the dominant role. He testified he was heterosexual "on the street" but bisexual in prison, and would not classify himself as homosexual. Defendant denied that he had committed forcible attempted sodomy.

On cross-examination, when the prosecutor asked defendant whether he was gay, he responded in the negative. The prosecutor asked defendant about his having been disciplined for subscribing to Gay Sunshine magazine. She inquired about a photograph in his album depicting a partially unclothed man named Candi who claimed to love defendant. Defendant explained that he and this individual merely corresponded and that Candi resided in another state. The prosecutor also asked defendant about a photograph "that appears to have part of a male body and something that may or may not be female." She stated the inscription was, "I'm getting a lesson in Hollywood on how to get a blowjob." The prosecutor again asked whether defendant had sexual relations with men outside prison, and defendant reiterated that he was in prison when he became acquainted with the individuals depicted in the photographs.

Defendant's direct testimony had suggested he had had consensual sexual relations with men in prison, that he was bisexual in those circumstances out of necessity, and that such contacts were infrequent. His testimony tended to

minimize the possibility that he would attempt to have forcible sexual relations with another man against the latter's consent. The prosecutor's cross-examination and use of exhibits in part impeached defendant's credibility. Evidence tending to contradict a witness's testimony is relevant for purposes of impeachment. (*People v. Lang* (1989) 49 Cal.3d 991, 1017 [264 Cal.Rptr. 386, 782 P.2d 627].) Although the prosecutor appears to have dwelled on evidence of defendant's sexual preferences in a manner suggesting that this evidence was a negative reflection on defendant, without regard to its illumination of defendant's credibility, any possible harm could have been cured by timely objection by counsel and admonition to the jury by the trial court. (*People v. Jones, supra*, 15 Cal.4th 119, 181.)

Defendant contends that the prosecutor improperly used defendant's age as a factor in aggravation by asserting that life imprisonment without the possibility of parole would be appropriate if defendant were 17, 18, 19, or 20 years of age, but was inappropriate because defendant was older. The consideration of a defendant's age in argument or instructions is proper. (*People v. Sandoval, supra*, 4 Cal.4th 155, 189-190.) As we have explained, age may refer to any age-related matter suggested by the evidence, common experience, or morality that " ' "might reasonably inform the choice of penalty." ' " (*People v. Proctor* (1992) 4 Cal.4th 499, 554 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) A permissible inference is that "defendant is 'old enough to know better.' " (*People v. Clark, supra*, 3 Cal.4th 41, 170.)

Defendant asserts the prosecutor improperly suggested to the jurors that defendant might be able to "just walk out of here" unless they voted for a death verdict. This claim is not supported by the record. The prosecutor argued that defendant wanted the jurors who were religious to view that circumstance as a reason not to vote for the death penalty, even though defendant "voted for the death penalty three times and twice he succeeded. . . . And he wants you to use different values than he uses. [¶] Well, I want you to use different values, too. I want you to use the factors in aggravation and the factors in mitigation and weigh it. I don't want you to use the selfish purpose that he used. I don't want you to just walk up and say, 'You're out of here,' because that's exactly what Mr. Cunningham did. As cold, calculated as you please, he just said, 'Boom, you're dead.' He didn't say, 'Tell me about your life. . . .' "

It is apparent from the foregoing context that the prosecutor's comments did not refer to the possibility of defendant's being released from prison. Instead, the prosecutor admonished the jurors to consider and weigh the penalty and not vote for the death penalty automatically as defendant in effect had done with his victims. There is no reasonable likelihood that the

jury understood the argument in the manner urged by defendant. (*People v. Sanders, supra,* 11 Cal.4th 475, 526.)

Defendant claims that the prosecutor engaged in argument calculated to dehumanize him by suggesting that "it is hard for people like any of us in this courtroom, who have not shot somebody and watched them die, who have not experienced something like that and say, 'let me weigh this.'" Defendant also urges that the prosecutor's comments concerning defendant's lack of emotion while his mother cried on the witness stand, and concerning his motive for shooting himself in the stomach, similarly were intended to convince the jurors that defendant was less than a human being.

The prosecutor appropriately commented that the jurors' task was difficult in view of their lack of experience. The other comments were directed at reminding the jurors that defendant was calculating and inhumane rather than inhuman or beneath humanity. The prosecutor did not commit misconduct.

### c. *References to matters outside the record*

Defendant contends that the prosecutor committed misconduct by arguing factual matters that were not part of the evidence presented. ██ A prosecutor commits misconduct by referring in argument to matters outside the record. (*People v. Pinholster, supra,* 1 Cal.4th 865, 948.) Nonetheless, a prosecutor " 'may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature.' [Citation.]" (*People v. Sandoval, supra,* 4 Cal.4th 155, 193.) In addition, the prosecution has broad discretion to state its views regarding which reasonable inferences may or may not be drawn from the evidence. (*People v. Mitcham, supra,* 1 Cal.4th 1027, 1052.) Arguments by the prosecutor that otherwise might be deemed improper do not constitute misconduct if they fall within the proper limits of rebuttal to the arguments of defense counsel. (*People v. Sandoval, supra,* 4 Cal.4th at p. 193.)

██ Defendant asserts that the prosecutor referred to several facts not supported by the record. The prosecutor's references, however, *do* find support from the evidence or permissible inferences drawn from it. The prosecutor stated that when defendant shot Officer Osmond, he was a felon and knew he was not permitted to carry a firearm. Defendant testified he knew persons convicted of a felony in California were not permitted to carry guns. Defendant was a convicted felon at the time he shot the officer. The prosecutor stated that defendant was not intoxicated at the time of that shooting. Neither defendant, nor the officers who variously described the incident, testified that defendant was intoxicated.

The prosecutor also stated that some of the stab wounds inflicted on Fellows would have been fatal almost immediately, but that defendant continued to stab her repeatedly. The medical examiner testified that certain wounds would have been immediately fatal, but that nonetheless additional wounds were inflicted.

Defendant asserts that the prosecutor offered unfounded conjecture concerning defendant's behavior. The prosecutor commented that defendant did not receive psychiatric care in prison because he sought medication, whereas most therapy treatment consisted of speaking with a therapist. Contrary to defendant's assertions, these comments did not denigrate drug therapy but merely suggested defendant was not amenable to accepting a form of treatment that was more readily available. The prosecutor commented that by the time defendant attempted to commit suicide, he had been convicted of an offense and had received probation. This comment was made during argument in rebuttal to defendant's assertion that he never had received any leniency.

Defendant asserts that the prosecutor made comments deprecating his contributions to society or characterizing them as useless. In rebuttal to defense evidence that defendant had served on the Men's Advisory Council, the prosecutor emphasized the detail that he had served as its secretary, arguing that such a position generally does not entail engaging in a leadership role but rather in "tak[ing] notes." It was permissible for the prosecutor in rebuttal to question the actual level of defendant's involvement, in view of defendant's position in the organization. In rebuttal to the argument that if permitted to live in prison defendant would teach the hearing impaired, the prosecutor wondered how many hearing-impaired individuals would be in prison and whether other provisions already would have been made for them by the penal institution. This argument was within the permissible limits of rebuttal to defendant's argument.

In addition, it does not appear that these statements resulted in prejudice to defendant. Although the prosecutor appeared to dwell on the subject of defendant's apparent sexual preferences, which were not strictly germane to the effort to impeach his credibility, neither any such error, nor any other, has been shown to have significantly influenced the fairness of defendant's trial or detrimentally affected the jury's determination of the appropriate penalty, so as to warrant reversal of the penalty judgment. (*People v. Sanchez, supra,* 12 Cal.4th 1, 83.)

### 4. Dismissal of juror

#### a. Trial court's failure to order a mistrial

 Defendant contends the trial court committed error in connection with its dismissal of Juror Ne. near the conclusion of the penalty phase. Defendant maintains that by failing to order a new trial or a hearing into the juror's competency, while expressing doubts concerning her sanity, the trial court impaired defendant's rights to trial by a competent jury, due process of law as heightened in a capital case, and reliable determinations of guilt and special circumstances. Defendant urges that Juror Ne. exhibited signs of mental instability during jury voir dire and that her participation in the guilt and special circumstance phases of the trial thus requires reversal of the judgment.

The record reflects that during the individual death-qualifying voir dire, Juror Ne. gave negative responses to questions designed to ascertain whether she automatically would vote for or against the death penalty. She explained that she was working on her thesis but felt she could sit on a jury as well. In general voir dire, asked about being a juror in a death penalty case, she stated she did not have any bias for or against the death penalty and could perform her duty. When she actually was selected as a juror, however, she inquired whether it was too late to be excused, explaining her concern about committing herself for six weeks, her stressful experiences during the previous 14 months, and her belief that she would be excused because she was a teacher and the wife of a lawyer. The trial court discussed the understandable apprehension a juror would feel at the prospect of sitting on such a case, noted that the prosecution and the defense believed she could be fair, stressed her intelligence, integrity, and sense of duty, and asked her, as one citizen to another, to remain on the panel. Juror Ne. stated that she would attempt to do so and that she valued the opportunity to participate.

Following the guilt and special circumstance verdicts, on August 24, 1988, Juror Ne. informed the trial court that her father had suffered a serious stroke and that she was concerned about the length of the trial. When the court indicated that the trial would conclude within several weeks, Juror Ne. stated that she planned to continue but would rather spend the time with her father.

On August 31, 1988, in response to an inquiry by another juror, the court indicated that the trial would conclude on September 2, 1988, a Friday, on which day the jury would commence its deliberations. Juror Ne. informed the trial court that she had a flight reservation to visit her dying father on that

day because the judge had released the jury on the previous Fridays. The trial court discussed the matter with counsel, who believed that the juror was too preoccupied with the impending death of her father to be effective, and with defendant, who believed Juror Ne. was very weak and would be totally influenced by the other jurors. The trial court agreed to excuse the juror.

When the trial court informed Juror Ne. she was being excused, however, she commented that she already had invested 27 days in the case, was not the only person being inconvenienced, wanted to remain on the jury, and would attempt to obtain other flight reservations. She also added, however, that "if you think this might prejudice the case in any way, I'd be glad to say that I would request to be dismissed completely." In chambers, the trial court stated: "With this latest statement, I doubt this woman's sanity. . . . I was cursed this morning because I wouldn't excuse her. Now I am being cursed because I will excuse her." The parties indicated that they still wished to excuse Juror Ne., because they did not believe she was capable of performing as a juror in this case. Thereafter, the trial court excused Juror Ne. and selected an alternate juror to take her place.

It is apparent that defense counsel not only did not object to the substitution of the juror or move for a mistrial, but sought to have her excused. Therefore, the present claim of error is waived. (See *People v. Fudge, supra,* 7 Cal.4th 1075, 1100-1101.) In any event, the trial court did not err. Section 1089 provides, in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place." ▮ "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821 [12 Cal.Rptr.2d 682, 838 P.2d 204].) The trial court's ruling is reviewed for an abuse of discretion. (*People v. Ashmus, supra,* 54 Cal.3d 932, 987.)

▮ In the present case, the trial court performed its duty to make reasonable inquiry, determining that by reason of her distress over, and need to visit, her dying father, Juror Ne. was unable to fulfill her duties as a juror. The death of a juror's parent constitutes good cause to discharge the juror if it affects the juror's ability to perform his or her duties. (*People v. Ashmus, supra,* 54 Cal.3d 932, 986-987.) By making a brief and apparently flippant remark concerning Juror Ne.'s sanity in reference to her apparent vacillation as to whether or not she should continue to serve, the trial court did not

thereby make any finding of actual incompetence on her part to perform the duties of a juror, much less a finding that the juror had been incompetent during the earlier proceedings. Nor do Juror Ne.'s comments, either during jury selection or at the time of her excusal, suggest that such a finding would have been warranted. (See *People v. Beeler* (1995) 9 Cal.4th 953, 972-975 [39 Cal.Rptr.2d 607, 891 P.2d 153].) Particularly because all parties agreed that the juror should be excused after demonstrating her inability to perform her duties, the trial court did not abuse its discretion in discharging the juror, nor in failing to declare a mistrial.

b. *Trial court's failure to instruct jury to commence deliberations anew*

Defendant also contends that the trial court erred in failing to instruct the jury, upon substitution of the alternate juror, that it must begin deliberations anew with respect to the guilt and special circumstances findings. The excusal of a juror for good cause and the substitution of an alternate at the penalty phase prior to commencement of deliberations do not require a retrial of the guilt phase or a reweighing of the evidence received at the earlier phase of the proceedings. (*People v. Cain, supra*, 10 Cal.4th 1, 66.) As defendant recognizes, the rule announced in *People v. Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d 742], requiring the trial court to instruct the jurors to commence deliberations anew when a substitution is effected in the midst of deliberations, does not apply when, as in the present case, the alternate juror joins the panel of jurors after the conclusion of the guilt phase and prior to the commencement of deliberations at the penalty phase. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1187-1188 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People v. Ashmus, supra*, 54 Cal.3d 932, 1005; *People v. Brown* (1988) 46 Cal.3d 432, 460-461 [250 Cal.Rptr. 604, 758 P.2d 1135].) We also have held that a sua sponte instruction on lingering doubt is not required at the penalty phase and, having reviewed the facts of the present case, we ascertain no reason to reach a different conclusion under these circumstances. (*People v. McPeters, supra*, 2 Cal.4th at p. 1188.)

5. *Ineffective assistance of counsel*

Defendant contends that defense counsel rendered ineffective assistance throughout the penalty phase, resulting in prejudice to their client. ▆ Defendant bears the same burden of demonstrating ineffective assistance of counsel at the penalty phase as at the guilt phase. (*People v. Mayfield, supra*, 5 Cal.4th 142, 185.) Defendant must establish not only that there was ineffective representation that fell below an objective standard of reasonableness, but also that prejudice resulted. (*People v. Lucero* (2000) 23

Cal.4th 692, 728 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Hart, supra,* 20 Cal.4th 546, 634.) Prejudice is established when the record demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. 668, 694 [104 S.Ct. 2052, 2068].)

"When . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons . . . . Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal. [Citation.]" (*People v. Diaz, supra,* 3 Cal.4th 495, 557-558.)

### a. *Preparation and presentation of defense evidence*

 Defendant contends that defense counsel rendered ineffective assistance by failing to request a continuance prior to the commencement of the penalty phase so as to be able to prepare their witnesses, inasmuch as they had elected to present the defense evidence in mitigation before the prosecution's presentation of evidence. In fact, the defense requested and received a one-day continuance in which to prepare defendant for his testimony. The record does not demonstrate that defense counsel lacked adequate time to prepare this or any other witness.

Defendant asserts that, as a result of defense counsel's failure to prepare him for his testimony, he made damaging statements. He admitted that he had a drinking problem, had had sexual encounters with men in prison, had been a pimp for drag queens, had learned "the revolutionary stage" from Huey Newton in prison, and could not recall the circumstances of Ella Mae Fellows's death. Defendant also implied that Police Officers Osmond and Lane were to blame for the shootout because they did not identify themselves; defendant volunteered that he had struck his former wife, and he explained he did not testify at the guilt phase because he did not think the jury would believe Cebreros's testimony.

The record does not reflect the nature of defense counsel's preparation of defendant, and therefore we cannot determine that any of this testimony was the result of defendant's lack of preparation. (*People v. Osband* (1996) 13 Cal.4th 622, 701 [55 Cal.Rptr.2d 26, 919 P.2d 640].) In addition, because even the most carefully prepared witness may give a surprise answer, we may not hold defense counsel responsible for the potentially damaging

responses furnished by a defendant or another witness. (*People v. Gates* (1987) 43 Cal.3d 1168, 1213-1214 [240 Cal.Rptr. 666, 743 P.2d 301].)

Defendant also asserts that his counsel's failure to prepare him adequately subjected him to "devastating" cross-examination, permitting the prosecutor to establish through defendant's own testimony, among other negative facts, that while in prison defendant had incurred a number of infractions, had been fired as a clerk after several weeks, and had used a wheelchair after it no longer was medically necessary. Similarly, the prosecutor was permitted to establish that defendant possessed magazines and photographs with homosexual themes despite having stated he was not homosexual, indicated that "his mind was clear" at the time of the murder of Fellows despite his testimony on direct examination that he could not remember that event, denied killing Fellows, and stated that a psychiatrist who interviewed him following that murder had made misrepresentations in the ensuing written reports.

The circumstance that negative facts were elicited during cross-examination does not demonstrate that defense counsel inadequately prepared defendant to testify. Nothing in the record suggests defendant did not intend to describe detailed aspects of his behavior; rather, based upon the lengthy account he gave of his life and feelings, especially while in prison, the description appears to have been a tactical decision. On the basis of the present record, we cannot say that trial counsel provided constitutionally deficient representation in permitting defendant to testify to his life history, including his lengthy stays in prison, despite the knowledge that certain damaging details would be elicited during the prosecutor's cross-examination.

Defendant contends that defense counsel rendered ineffective assistance by failing to produce documentary evidence or testimony from other witnesses to substantiate defendant's testimony. He asserts that defense counsel should have introduced records of medical procedures, attempts to obtain psychiatric assistance, employment and volunteer work, and efforts to improve defendant's recollection of the Fellows murder. Defense counsel assertedly also should have produced witnesses present at the time of defendant's shootout with the police officers. Defendant has not established that such records exist or were available to counsel, or that such witnesses could be located, and the record does not reveal defense counsel's reasons for not introducing such evidence, assuming it was available.

Defendant asserts that defense counsel failed to introduce into evidence six letters of commendation from his prison employers. When defense

counsel inquired of a parole officer familiar with defendant's records memorializing his conduct in prison, the parole officer testified concerning the laudatory reports contained in defendant's records. Although the trial court denied defense counsel's request that every one of these letters be admitted, several of the letters of commendation were included within another exhibit. Accordingly, defendant has not demonstrated deficient performance in representation below an objective standard of reasonableness, nor has prejudice been established. (*People v. Lucero, supra,* 23 Cal.4th 692, 728.)

Defendant asserts that defense counsel were ineffective both because they selected witnesses to testify on defendant's behalf (defendant's mother, a family friend, and a representative from the temporary employment agency) who did not effectively present evidence in mitigation, and because counsel did not offer documentation in support of their testimony. These witnesses, especially defendant's mother, offered considerable testimony describing circumstances in mitigation. The circumstance that these witnesses were impeached in some respects with other evidence does not suggest defense counsel were ineffective in offering their testimony or in preparing them to testify. These witnesses may have been the best available to the defense. We cannot conclude there was deficient performance, much less prejudice, upon the record before us. (*People v. Osband, supra,* 13 Cal.4th 622, 735.)

Defendant contends that defense counsel rendered ineffective assistance by failing to present the testimony of psychiatric experts. The record discloses that two psychiatrists met with defendant prior to the penalty phase. The record does not reflect what evidence might have been presented as a result of such examination, and we are therefore unable to infer anything about its existence, probative force, or the probable consequences at trial, had such evidence been presented. (*People v. Wash, supra,* 6 Cal.4th 215, 269; see *People v. Berryman, supra,* 6 Cal.4th 1048, 1108.) Defendant has not established that he received ineffective assistance. (*People v. Wash, supra,* 6 Cal.4th at p. 269.)

### b. *Omission of theory in mitigation*

Defendant contends that defense counsel rendered ineffective assistance by failing to present evidence to establish that defendant committed the murder while under the influence of alcohol in combination with medication that adversely affected his mental capacity—evidence that would have suggested he was less culpable and less deserving of the death penalty. Defendant observes that pursuant to section 190.3, factor (h), the jury was authorized to consider whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication.

In fact, defendant testified that on the evening of the shooting he had visited several bars. He also testified that he had a drinking problem and that when he became intoxicated, he was not in control of his behavior. The record does not disclose what investigation was performed by counsel, what evidence might have been derived from defendant's use of alcohol in combination with medication, and what effect such evidence might have had on the jury. Therefore, we cannot conclude on the record before us that counsel provided ineffective assistance. (*People v. Ochoa, supra,* 19 Cal.4th 353, 433-434; *People v. Millwee, supra,* 18 Cal.4th 96, 148-149; *People v. Hayes* (1990) 52 Cal.3d 577, 636 [276 Cal.Rptr. 874, 802 P.2d 376].)

### c. *Response to evidence of attempted sodomy and sexuality*

 Defendant contends that defense counsel rendered ineffective assistance in failing to move for a continuance, to reopen jury voir dire in order to ascertain any bias based on the matter of sexual orientation, or to select a new jury when the existing jury learned during the guilt phase that the prosecution intended at the penalty phase to present evidence of attempted sodomy. Defense counsel purportedly also were ineffective in failing to prepare a defense to that evidence, and in failing to object to the jury instructions on the subject of attempted sodomy.

The record discloses that the defense objected at the outset of the penalty phase to the admission of this evidence. Upon their request, defense counsel were granted a continuance to permit them to interview potential witnesses housed in the same cellblock area as defendant, who apparently had contacted these individuals previously. Defense counsel may have had tactical reasons for not requesting an additional continuance, for example to avoid possibly alienating the jury. (*People v. Johnson, supra,* 6 Cal.4th 1, 50-51.) Defense counsel simply may have contacted the available witnesses during the time period provided. (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1153-1154.) Defense counsel may have decided to decline to ask jurors any questions on this subject as a matter of trial tactics (see *People v. Horton, supra,* 11 Cal.4th 1068, 1123; *People v. Freeman, supra,* 8 Cal.4th 450, 485), and counsel reasonably could decide not to emphasize the subject by reopening voir dire. Similarly, defense counsel reasonably could have concluded as a matter of tactics that it was preferable not to move to select a new jury, and in any event it appears highly unlikely that such a motion would have been successful. Finally, the record contains no indication of actual bias on the part of any juror resulting from the introduction of this evidence.

The record does not establish that defense counsel failed to prepare to defend against the testimony concerning the attempted sodomy incident. The

testimony to be offered by the prosecution was not lengthy or complex, requiring significant investigation. Defense counsel had the opportunity to contact potentially helpful witnesses, and there is no indication additional witnesses could have been located or would testify differently from White. Nor does counsel's failure to request a jury instruction defining attempted sodomy indicate ineffective assistance. Defense counsel as a matter of trial tactics frequently do not seek extensive jury instructions on the elements of purported criminal activity introduced at the penalty phase. (*People v. Hawkins, supra,* 10 Cal.4th 920, 963-964; *People v. Tuilaepa, supra,* 4 Cal.4th 569, 592.)

Defendant contends that his counsel rendered ineffective assistance in eliciting defendant's testimony as to his sexual preferences, and in failing to object to the prosecutor's questions on that topic and to the admission of related photographs. Defense counsel reasonably could have decided to elicit defendant's testimony concerning his sexual practices and those of inmates generally in order to persuade the jury that any attempted sodomy was consensual. Having raised the subject, defense counsel reasonably may have refrained from objecting to the prosecutor's questions regarding defendant's sexual preferences, in that defendant's responses to those questions did not detract from the defense theory that the act was consensual. Defense counsel reasonably could conclude that the admission of the photographs, as part of a family album, on balance would be more helpful than harmful to the defense.

Defendant has not demonstrated that defense counsel's acts or omissions constituted representation below an objective standard of reasonableness, nor has he demonstrated prejudice. (*People v. Lucero, supra,* 23 Cal.4th 692, 728.)

### d. *Failure to move to exclude testimony of Beverly Son*

Defendant contends that defense counsel provided ineffective assistance in failing to move to exclude the testimony of Beverly Son, defendant's girlfriend at the time of the murder, on the basis that it was improperly induced by the police and was substantially more prejudicial than probative. Following Son's testimony, defense counsel acknowledged that they had intended but neglected to object to the admission of her testimony and to request a hearing pursuant to Evidence Code section 402 for the purpose of determining whether Son's testimony had been coerced by the police. The trial court, noting Son was not under subpoena to testify, indicated that a hearing to determine whether her testimony was coerced was unnecessary.

Defendant bases his assertion of police intimidation upon Officer Baroni's interview with Son on July 18, 1988. The officer inquired whether defendant

ever had taken Son to his apartment on 126th Street, and when she responded affirmatively, Baroni commented, "That's kind of scary." When she asked why, Baroni responded that that was where defendant dropped the last body. When Son asked whether that had in fact happened, Baroni answered affirmatively. Baroni also asked whether defendant had said anything about hating women. Son responded that the officer was scaring her and asked that her address not be provided to defense counsel.

■ "[I]f the defendant seeks to exclude a third party's testimony on the ground the testimony is somehow coerced or involuntary, '[a]ny basis for excluding [the third party's] testimony must be found in a federal constitutional right *personal* to defendant.' [Citation.] Further, the basis of the claim must be that coercion has affected the third party's trial testimony. . . . [¶] . . . When a defendant seeks to exclude evidence on this ground, the defendant must allege that the trial testimony is coerced [citation], and that its admission will deprive him of a fair trial [citation]." (*People v. Badgett* (1995) 10 Cal.4th 330, 344 [41 Cal.Rptr.2d 635, 895 P.2d 877].)

■ Defendant asserts that by falsely informing Son that the prior murder victim had been "dropped" at defendant's apartment and making other comments suggesting that Son should be fearful, Officer Baroni induced the witness to testify at the trial, and thus to remember details not reported in an earlier interview she had furnished the police. The alleged police misconduct here is not of the type that would rise to the level of coercion. (*People v. Badgett, supra,* 10 Cal.4th 330, 344.) Defense counsel therefore did not render ineffective assistance in failing timely to seek a hearing to explore that allegation.

In addition, the evidence was not otherwise subject to exclusion on the ground that it was substantially more prejudicial than probative. (*People v. Box, supra,* 23 Cal.4th 1153, 1200-1201.) The trial court's discretion to exclude evidence pertaining to the circumstances of the present offense, pursuant to Evidence Code section 352, was more circumscribed at the penalty phase than at the guilt phase. (*Box,* at pp. 1200-1201; *People v. Ray, supra,* 13 Cal.4th 313, 349-350.) The jury previously had found defendant present at, and guilty of, the shooting of Treto. Son merely testified that the next morning, defendant had arrived late, informing her that he had been at the location where a shooting had occurred but denying culpability.

Finally, given the nature of Son's testimony, it is not reasonably probable that even had defense counsel successfully excluded her testimony, the outcome would have been more favorable to defendant. (*People v. Lucero, supra,* 23 Cal.4th 692, 728.)

Defendant also contends that defense counsel's failure to obtain a reporter's transcript of the prior murder trial kept the defense from learning that Officer Baroni had misstated the location where the body had been "dropped." Deputy Sheriff Kushner, however, testified to the actual location of the body, and therefore defense counsel could infer that a possible misstatement had been made by the officer at the interview, even in the absence of the reporter's transcript. Defendant further contends that defense counsel improperly acquiesced to the trial court's order that they contact Son through the police because she was fearful and did not want the defense to have her address. (§ 136.2.) Nothing in the record, however, establishes that the ruling actually prevented defense counsel from contacting the witness.

### e. *Evidence of prior murder*

Defendant contends that defense counsel rendered ineffective assistance in failing to seek to reopen voir dire of the jurors on the subject of the prior murder of Ella Mae Fellows. As noted above, defense counsel may have sound tactical reasons not to question jurors on particular subjects. (*People v. Freeman, supra,* 8 Cal.4th 450, 485.) The jurors already knew of the prior murder, and defense counsel reasonably might have wished to refrain from reintroducing the subject of the prior offense.

Defendant contends that defense counsel rendered ineffective assistance in failing to object to (1) Deputy Sheriff Kushner's testimony concerning his postarrest interview with defendant, and the magazine and the photograph of the victim found in defendant's apartment, (2) the medical examiner's testimony concerning the state of the body, and (3) the photograph of a knife in defendant's apartment similar in size to the one that had inflicted the victim's wounds. This contention is based partially upon documents that we have declined to judicially notice. (*Ante,* at p. 1012, fn. 12.) The claim that defense counsel failed to object must be rejected on appeal when the record does not establish why counsel acted or failed to act in the manner challenged, unless counsel was asked at trial for an explanation and failed to provide one, or unless there could be no satisfactory explanation. (*People v. Mendoza* (2000) 24 Cal.4th 130, 186 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Mendoza Tello, supra,* 15 Cal.4th 264, 266.) Defendant has not shown that counsel was asked for and failed to provide an explanation for not objecting to this evidence, or that there could be no satisfactory explanation for counsel's decision not to object.

### f. *Failure to request instruction to redetermine guilt and special circumstances following excusal of juror*

Defendant contends that defense counsel was ineffective in failing to move for an instruction informing the jurors that they must deliberate

again as to guilt and special circumstances because of the excusal of the juror during the penalty phase. Nothing that transpired during the proceedings suggests that defendant was entitled to such redetermination of the guilt and special circumstance issues simply because the juror who subsequently was excused participated in those deliberations. Accordingly, defendant was not entitled to such an instruction. In addition, the instruction was not required with regard to the penalty phase, because the jury had not yet commenced deliberations at that phase. (See *People v. Wright* (1990) 52 Cal.3d 367, 420 [276 Cal.Rptr. 731, 802 P.2d 221].)

Moreover, prior to commencing their deliberations, the jurors received instructions that, having heard *all* of the evidence, they were to decide the penalty, and in so deciding, they were to consider the circumstances of the present offenses. In effect, the jurors were advised to reconsider evidence presented at the preceding phases of the trial in deciding the appropriate penalty. There is no reasonable probability that the result would have been more favorable to defendant, even had his counsel requested and the jury received the instruction in question.

### g. *Failure to object to prosecution argument*

Defendant also contends that defense counsel was ineffective in failing to object to the assertedly improper arguments of the prosecutor described above. (*Ante*, at pp. 1022-1027.) We have concluded that no prejudicial misconduct occurred. Accordingly, there can be no prejudice from defense counsel's failure to object. (*People v. Thomas, supra,* 2 Cal.4th 489, 531; see *People v. Lucas, supra,* 12 Cal.4th 415, 494.)

### 6. *Cumulative error*

Defendant contends that the cumulative effect of the error at the guilt, special circumstance, and penalty phases compromised his right to a fair trial and to a reliable penalty determination, requiring reversal of the judgment of death. Such error as did occur, viewed cumulatively, "did not significantly influence the fairness of defendant's trial or detrimentally affect the jury's determination of the appropriate penalty." (*People v. Sanchez, supra,* 12 Cal.4th 1, 84; see *People v. Welch* (1999) 20 Cal.4th 701, 775 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

### 7. *Automatic motion to modify penalty*

For the first time in his reply brief, defendant contends that the trial court employed an incorrect legal standard to review the jury's determination, failed to reweigh the aggravating and mitigating circumstances independently, and failed to state its reasons adequately in denying his application to modify the death verdict pursuant to section 190.4, subdivision (e).

Under that statute, the trial court is required to " 'independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict.' [Citations.]" (*People v. Millwee, supra,* 18 Cal.4th 96, 166; *People v. Crittenden, supra,* 9 Cal.4th 83, 150; *People v. Marshall, supra,* 50 Cal.3d 907, 942.)

Defendant observes that in its statement of reasons for denial of the motion to modify the death verdict, the trial court made references to determining whether the jury had a substantial basis for rendering its verdict, whether the verdict was adequately supported by the evidence, and whether the trial was fair and free of error requiring the verdict to be set aside. Defendant urges that, in effect, the trial court decided whether the verdict was supported by substantial evidence and whether the trial was fair, rather than itself reweighing the evidence pursuant to the statutory direction.

The record reflects that in describing its duties with regard to the motion, the trial court also stated it was required "to go over the entire trial and the penalty phase with a fine tooth comb to be sure that everything was done correctly and that the court can find and be comfortable in its own mind that the jury had adequate basis for making the recommendation that they made and whether . . . the court might want to disagree with the jury and reduce the penalty. . . ." The trial court advised, "I have gone over my trial notes . . . I looked at the exhibits. I have analyzed the testimony of each witness. . . ." The trial court looked for "every conceivable angle upon which we could do something other than what the jury has proposed to do in this case." The trial court "considered and weighed the aggravating and mitigating circumstances in the same manner in which the jury is required to do. The court thoroughly perused its notes and is satisfied that the jury has arrived at a fair and legal determination [of penalty] and has concluded that the jury has not erred and that their verdict must be upheld."

The trial court's comments do not indicate that it believed it must uphold the verdict if the verdict was supported by substantial evidence, or if, overall, the trial was fair. Although the trial court *also* discussed whether defendant received a fair trial and whether errors were made, the court's discussion as a whole demonstrates an awareness that it was required independently to reweigh all the evidence, including the mitigating evidence. (*People v. Pinholster, supra,* 1 Cal.4th 865, 971-972; *People v. Edwards* (1991) 54 Cal.3d 787, 846-847 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

Defendant also contends that the trial court erred in failing to state on the record its specific reasons for denying the application to modify penalty and

merely made a general statement that the circumstances in aggravation outweighed the circumstances in mitigation. Defendant cites *People v. Bonillas* (1989) 48 Cal.3d 757, 801 [257 Cal.Rptr. 895, 771 P.2d 844], in which the trial court merely issued the statement that " 'I think the aggravating circumstances were there, that they did exceed the mitigating circumstances.' " (Italics omitted.) We held the statement was "insufficiently specific," in failing to indicate which circumstances the trial court considered or deemed relevant or their relative importance. (*Ibid.*; *People v. Dennis* (1998) 17 Cal.4th 468, 550-551 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

Defendant overlooks the circumstance that in the present case, the trial court indicated it relied on the circumstances that the crime was cold-blooded, that the victim was "slain unnecessarily for a paltry sum of money," that there was no indication the victim was shown any mercy, and that defendant had no other purpose than enriching himself with the money that the victim had displayed earlier. In particular, the trial court properly considered as an aggravating factor the motive of financial gain. (*People v. Riel, supra*, 22 Cal.4th 1153, 1223.) The trial court's recitation of those aggravating factors, in combination with the trial court's additional statements that it had considered and weighed the circumstances in aggravation and those in mitigation, sufficiently set forth the trial court's reasons for its refusal to modify the penalty and are adequate to permit appellate review. (*People v. Dennis, supra*, 17 Cal.4th 468, 551 [trial court's omission of other possible mitigating factors from its comments did not render its statement of reasons defective]; *People v. Arias, supra*, 13 Cal.4th 92, 191-192 [court was obliged only to provide a ruling adequate " ' "to assure thoughtful and effective appellate review" ' "]; *People v. Sanders, supra*, 11 Cal.4th 475, 566 [trial court's conclusion that " '[t]here is absolutely nothing in the record that the court could find to mitigate in that regard' " did not mean that it failed to consider all of the evidence presented in mitigation; court expressly stated that it had reviewed all of the aggravating and mitigating evidence]; see *People v. Box, supra*, 23 Cal.4th 1153, 1219-1220; *People v. Majors* (1998) 18 Cal.4th 385, 416-417 [75 Cal.Rptr.2d 684, 956 P.2d 1137].) The trial court's statement of reasons was adequate.[15]

### 8. *Miscellaneous contentions*

 Defendant contends that the 1978 death penalty law lacks certain procedural safeguards and contains a number of substantive flaws. On past

---

[15]The record also reflects that following both the denial of the application and sentencing, the trial court informed defense counsel that it had received two or three "independent communications" from defendant's mother to the court and had read and considered them before making the judgment.

occasions we have rejected such claims and decline defendant's request to reconsider our rulings. We briefly describe the claims below in denying them.

We have rejected the contention that the death penalty statutes are unconstitutional because they inadequately narrow the class of homicide offenders eligible for that penalty as required by the federal Constitution, and we have declined to construe the California Constitution differently from the federal Constitution on this point. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321]; *People v. Ray, supra,* 13 Cal.4th 313, 356-357; *People v. Arias, supra,* 13 Cal.4th 92, 186-187; *People v. Davenport, supra,* 11 Cal.4th 1171, 1225.)

We have rejected the claim that it is prejudicial not to delete factors listed within section 190.3 from the corresponding jury instruction (CALJIC No. 8.84.1) when some of those factors are inapplicable in a given case. (*People v. Webb* (1993) 6 Cal.4th 494, 532-533 [24 Cal.Rptr.2d 779, 862 P.2d 779].)

We have rejected the contention that the sentencing factors are unconstitutional because they do not specify which factors are aggravating and which are mitigating. (*People v. Bradford, supra,* 15 Cal.4th 1229, 1383; *People v. Osband, supra,* 13 Cal.4th 622, 705-706.) The factors in aggravation are not unconstitutionally vague. (*People v. Bradford, supra,* 15 Cal.4th at p. 1384.) The use of the words "extreme" and "substantial" in factors (d) and (g) of section 190.3 does not violate the federal Constitution by impermissibly limiting consideration of mitigating factors. (*People v. Barnett, supra,* 17 Cal.4th 1044, 1178.) The failure of the instructions to convey that the absence of mitigating factors may not be used in aggravation does not render them unconstitutional (*People v. Ashmus, supra,* 54 Cal.3d 932, 1004-1005 & fn. 26), and thus the trial court did not err in declining to so instruct the jury. (*Ibid.*)

We have rejected the contention that the failure to define the terms "aggravating" and "mitigating" violates the federal Constitution. (*People v. Hawkins, supra,* 10 Cal.4th 920, 965-966.) The trial court did not err in declining defense counsel's request that it do so. (*Id.* at p. 965; *People v. Johnson, supra,* 6 Cal.4th 1, 50.)

The trial court is not required, under either the federal or the state Constitution, to give an instruction stating that if the jury has a doubt which penalty to impose, it must give defendant the benefit of the doubt and return a verdict of life imprisonment without possibility of parole, nor is it required to instruct that all 12 jurors must find each aggravating factor to be true

beyond a reasonable doubt. (*People v. Barnett, supra,* 17 Cal.4th 1044, 1178; *People v. Berryman, supra,* 6 Cal.4th 1048, 1101.)

The jury's consideration of unadjudicated criminal activity does not violate the right to due process of law, to a fair and impartial jury, or to a reliable penalty determination under the Sixth and Eighth Amendments to the federal Constitution or under the state Constitution. (*People v. Barnett, supra,* 17 Cal.4th 1044, 1178; *People v. Samayoa* (1997) 15 Cal.4th 795, 863 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *Stanley, supra,* 10 Cal.4th 764, 821-823.) A trial court is not required to instruct that the jurors must agree unanimously that the defendant committed each unadjudicated offense before considering it in aggravation. (*People v. Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) The failure to instruct on the elements of the prior violent criminal acts (in particular, the attempted sodomy, in which the instruction given required a finding of force or violence) does not deny equal protection of the laws or the right to a reliable penalty determination under the federal Constitution. (*People v. Barnett, supra,* 17 Cal.4th at p. 1178; *People v. Hardy, supra,* 2 Cal.4th 86, 206-207.)

The trial judge is not required sua sponte to instruct the jury that it must assume that the penalty it imposes will be carried out. (*People v. Kipp* (1998) 18 Cal.4th 349, 377-379 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Ashmus, supra,* 54 Cal.3d 932, 994-996.)

Neither the federal nor the state Constitution requires intercase proportionality review. (*People v. Bradford, supra,* 15 Cal.4th 1229, 1383-1384.)

■ As defendant contends, a death sentence is subject to intracase review. (*People v. Bradford, supra,* 15 Cal.4th 1229, 1384.) We decide whether the penalty given "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity," thereby violating the prohibition against cruel and unusual punishment of the Eighth Amendment of the federal Constitution or against cruel or unusual punishment of article I, section 17 of the California Constitution. (*Solem v. Helm* (1983) 463 U.S. 277, 290-292 [103 S.Ct. 3001, 3009-3011, 77 L.Ed.2d 637]; *People v. Fairbank, supra,* 16 Cal.4th 1223, 1256; *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) The reviewing court examines "the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.]" (*People v. Lucero, supra,* 23 Cal.4th 692, 739; *People v. Riel, supra,* 22 Cal.4th 1153, 1223-1224.)

In the present case, defendant went to a bar and, having discovered a man who clearly was intoxicated and carried a large amount of cash, moved to a nearby bar where he prepared himself for the robbery, subsequently pointed the gun at the man and demanded money of him and his companion, and without encountering resistance from either victim proceeded to kill one victim and attempt to kill the other, who merely was attempting to escape. Defendant then drove off with the money in the vehicle of the dead man. In addition, defendant had an extensive prior criminal record, including a murder and a violent assault on a peace officer, spanning his adult and later juvenile years. The punishment imposed cannot be deemed grossly disproportionate, in light of the circumstances of the present offenses as well as the nature of the offender.

### 9. Sentencing

#### a. Separate sentencing

Defendant contends that his sentence on counts III (attempted murder), IV (attempted robbery), and V (felon in possession of a firearm) must be vacated because he separately was sentenced to death as well as to terms of imprisonment on these three counts, in violation of section 1191 and California Rules of Court, rule 433(d), and because the court had lost jurisdiction to sentence him.

The record reflects that the jury's verdict of death was rendered on September 2, 1988. The trial court indicated that defendant was entitled to be sentenced within 28 days (no later than Sept. 30, 1988), whereupon the defense moved for and was granted a continuance. Thereafter, the sentencing hearing was continued on a number of occasions, at which the trial court secured defendant's express waiver of the statutory time in which to impose sentence (on several occasions defendant was an in-custody "miss-out"). Following the hearing on the motion for a new trial and the application for modification of penalty, on June 16, 1989, the trial court sentenced defendant to death on count I for the murder conviction, remanding him to state prison.

On July 14, 1989, at the prison where defendant was housed, the trial court held a hearing, which it characterized as a continuance of the prior sentencing hearing. At that hearing, the court, acting pursuant to section 654, determined not to impose sentence on count II (the robbery of Treto, the murder victim). The court sentenced defendant to the upper term of nine years on count III (the attempted murder of Cebreros), with three years' enhancement for the finding of great bodily injury and two years' enhancement for the finding of use of a gun. The court imposed one-third the

midterm or eight months consecutively on counts IV (the attempted robbery of Cebreros) and count V (felon in possession of a firearm) as well as a five-year consecutive enhancement for each of the prior convictions, for a total term of 25 years and four months.

Section 1191 provided at the time of defendant's trial that the trial court must pronounce judgment within 28 days of the verdict, unless proceedings are continued. California Rules of Court, rule 433(d), provides that sentencing shall occur and be determined at a single hearing unless the sentencing judge orders otherwise in the interest of justice. Section 1202 provides that if the judgment is not rendered or pronounced within the statutory time or as continued under section 1191, the defendant is entitled to a new trial if he or she requests one.

As a general rule, the time limits on the pronouncement of sentence provided by section 1191 are not jurisdictional, but may be waived by the parties. (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 464 [279 Cal.Rptr. 834, 807 P.2d 1063]; *People v. Ford* (1966) 65 Cal.2d 41, 47 [52 Cal.Rptr. 228, 416 P.2d 132]; *People v. Williams* (1944) 24 Cal.2d 848, 850 [151 P.2d 244].) A judgment pronounced following the statutory time limit may not be reversed on appeal unless the delay resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Ford, supra,* 65 Cal.2d at p. 47.) Although defendant objected generally to the 28-day continuation of sentencing from the June 16, 1989, hearing to the hearing that was held on July 14, 1989, he did not move for a new trial. In any event, that delay between the two hearings did not result in a miscarriage of justice.

Defendant also contends that the trial judge could not impose sentences on the additional counts because defendant already was under restraint of sentence and therefore the trial court lacked jurisdiction to do so. (*People v. Karaman* (1992) 4 Cal.4th 335, 344-345 [14 Cal.Rptr.2d 801, 842 P.2d 100].) Defendant was not under restraint of sentence for the crimes represented by those counts, because the trial court previously had omitted to sentence him on the counts in question. Defendant also contends that the trial court could not impose these sentences because that trial court lost jurisdiction once a notice of appeal was filed. Although, as a general rule, "an appeal from an order in a criminal case removes the subject matter of that order from the jurisdiction of the trial court" (*Anderson v. Superior Court* (1967) 66 Cal.2d 863, 865 [59 Cal.Rptr. 426, 428 P.2d 290]), it is settled that an unauthorized sentence is subject to correction despite the circumstance that an appeal is pending. Because the trial court was not authorized simply to waive sentencing on these counts, any error in failing to impose sentence in this regard would have been subject to judicial correction

when it ultimately came to the attention of the trial court or this court. (Cf. *People v. Hester* (2000) 22 Cal.4th 290, 295 [92 Cal.Rptr.2d 641, 992 P.2d 569]; *People v. Serrato* (1973) 9 Cal.3d 753, 762-764 [109 Cal.Rptr. 65, 512 P.2d 289], overruled on another ground in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1 [189 Cal.Rptr. 855, 659 P.2d 1144]; *In re Sandel* (1966) 64 Cal.2d 412, 417-419 [50 Cal.Rptr. 462, 412 P.2d 806]; *People v. Terrell* (1999) 69 Cal.App.4th 1246, 1255 [82 Cal.Rptr.2d 231].)

### b. *Enhancement for prior murder conviction*

Defendant contends that the five-year enhancement imposed for defendant's prior conviction of second degree murder must be reversed because defendant's *Miranda* rights were violated by the police. This argument relies upon matters, outside the record, of which we already have declined to take judicial notice. (*Ante*, at p. 1012, fn. 12.) Accordingly, we do not address this issue.

### III. DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied August 15, 2001, and the opinion was modified to read as printed above. George, C. J., and Werdegar, J., did not participate therein.